HUFF, et ux, *Appellants, Cross-Respondents*
*v.*
BRETZ, *Respondent, Cross-Appellant.*
(TC 75-330-L, SC 25633)
592 P2d 204

[508]

Walter D. Nunley, Medford, argued the cause and filed the brief for appellants/cross-respondents.

Gene L. Brown of Brown, Hughes, Bird & Lane, Grants Pass, argued the cause and filed the brief for respondent/cross-appellant.

Before McAllister, Senior Judge, Presiding, and Holman, Tongue and Lent, Justices, and Joseph, Justice Pro Tempore.

TONGUE, J.

## TONGUE, J.

This is an action in ejectment to recover possession of a ranch because of alleged breaches of a lease agreement by the defendant, as lessee. Defendant filed an answer, counterclaim and "cross complaint". The answer denied the breaches of the lease and alleged equitable defenses of waiver and estoppel. The counterclaim sought to recover expenses incurred during occupancy of the property. The "cross complaint" asked for specific performance of the purchase option provision contained in the lease and also sought damages against plaintiffs for misrepresentations.

Because of the equitable defenses and the "cross complaint" for specific performance, the case was tried to the court as a suit in equity.[1] In a written opinion, the trial court held that plaintiffs had failed to establish breaches of the lease so as to permit them to terminate the lease and eject defendant; that the lease option was still in full force and effect; that defendant was entitled to specific performance of the purchase option provision; that defendant recover $395 on his counterclaim, and that defendant was not entitled to recover on his claim of damages for misrepresentation. Plaintiff appeals and defendant cross-appeals.

*The facts.*

In 1963 plaintiffs Paul and Shirley Huff purchased a ranch home with seventy-nine acres of land in Josephine County under a conditional sales contract. At the time of trial they still owed $25,000 under that contract. In 1970 Paul Huff's employment took him out of the country and plaintiffs decided to lease the ranch. Shirley Huff remained on the property to negotiate the lease.

In October of 1970 plaintiffs entered into the lease which is the subject of this litigation.[2] The lease

---

[1] The parties apparently agreed to this.

[2] The original lease was negotiated with Marvin Brewster. That lease was renegotiated with both Marvin Brewster and George Bretz as lessees. Marvin Brewster died in 1972. The complaint alleged that defendant succeeded to his interest in the lease.

provided, among other things, that the term of the lease would be for five years, from October 1, 1970, through September 30, 1975, and that it was understood that lessees intended to use the premises for the operation of a "Junior Dude Ranch." The lessees agreed to develop the pasture lands located on the property, to "maintain the premises in at least as good a condition and repair as it is at the beginning of this lease or as later improved, normal wear and depreciation from causes beyond lessees' control excepted" (such repair and maintenance to be at lessees' "own cost and expense"), and to "make beneficial use of all the water rights appurtenant to said land."

The lessees also agreed not to allow "any strip or waste to the premises," not "to cut or remove timber" from the premises without the lessors' permission (which prohibition "shall not apply to the cutting and removal of any dead or diseased trees or timber located or situated on the premises"), and not to sublet the leasehold in whole or in part without the prior written consent of the lessors.

The lease also provided that if the lessees defaulted or breached the lease in any respect and did not cure such default or breach within ten days after written notice given by the lessors, the lessors could, at their option, terminate the lease upon written notice of such termination.

Finally, under the terms of the lease the lessees were given a first option to purchase the property for $67,500. The procedure by which this option was to be exercised was set forth in detail in the lease.

After various disputes between the parties, plaintiffs on January 28, 1975, gave defendant written notice that they were terminating the lease (effective ten days after defendant's receipt of the letter) due to alleged breaches of the lease agreement by defendant. The letter demanded that defendant redeliver possession of the premises to plaintiffs. Defendant did not do so. Plaintiffs thereafter accepted rental payments

from defendant for the months of February, March and April.

In a letter dated April 7, 1975, defendant informed plaintiffs that "[p]ursuant to Paragraph XI of the Lease dated October 14, 1970, * * * you are hereby notified that I intend to exercise the option set forth in Paragraph XI(a) to purchase the property * * *." Plaintiffs did not complete the sale to the defendant under that option provision and on May 9, 1975, filed this action in ejectment. Plaintiffs then refused to accept defendant's monthly rental payments, and those payments were tendered into court.

One further matter deserves mention at this point. On January 10, 1975, prior to the notice of termination given by plaintiffs to defendant, the State Engineer gave both parties notice of the initiation of proceedings to cancel certain water rights appurtenant to twenty-five acres of the property in question. A hearing was held on that matter on June 19, 1975. On August 6, 1975, the Water Resources Director of the State of Oregon issued an order which stated that because water under that water right had not been appropriated for beneficial use for a period of five or more successive years prior to June 15, 1975, the water right had been forfeited under the provisions of ORS 540.610 to 540.650.

*Defendant did not breach the lease.*

Plaintiffs' first assignment of error is that the trial court erred in finding that defendant did not breach the lease. Plaintiffs' amended complaint alleged that defendant had breached the lease in that he had:

(a) cut and removed laurel and madrone trees for firewood without plaintiffs' consent;

(b) sold and removed fir, pine and cedar trees for logs without plaintiffs' consent;

(c) sublet the dwelling house to third parties without plaintiffs' consent;

(d) jammed rocks down the well casing (or that his sublessees had done so), destroying the usability of

[511]

the well, and that he had permitted it to remain that way;

(e) failed to make beneficial use of the water rights appurtenant to the land;

(f) failed to maintain perimeter fences in good repair;

(g) removed topsoil from parts of the tillable portion of the property, exposing the granite substrata and rendering the land useless for agricultural purposes;

(h) failed to maintain the leased farm equipment; and,

(i) failed to develop the pasture lands and farm the property in accordance with practices of good husbandry.

For purposes of analysis, these allegations will be considered in the following order: 1. trees (a,b); 2. water rights (e); 3. topsoil (g); and 4. other allegations of breach (c,d,f,h,i). In reviewing the evidence relating to these allegations, we do so in the same manner as in *Wilkinson v. Carpenter*, 276 Or 311, 554 P2d 512 (1976), in which we said (at 314):

"We have read the three volumes of transcript and have examined the exhibits. However, it would be of no assistance to the bar to delineate all of the conflicting evidence on both sides. Many of the witnesses presented were the parties or were employees or former employees of the parties. Since their testimony is often in conflict, the credibility of the witnesses becomes an important factor. Although we review the evidence de novo, in such cases we give substantial weight to the findings of the trial judge. *See e.g., Adamson v. Adamson*, 273 Or 382, 541 P2d 460 (1975)."

*1. Trees.*

Plaintiffs contend that defendant breached the provision of the lease which provides that "Lessees shall not suffer any strip or waste to the premises and shall not be entitled to cut or remove timber" (which prohibition "shall not apply to the cutting and removal of any dead or diseased trees or timber") both by

[512]

having cut and removed laurel and madrone and also by having sold and removed fir, pine and cedar.

In support of the allegation of breach in regard to the laurel and madrone, plaintiffs rely on the testimony of defendant on cross-examination that he had permitted others to cut and remove some laurel and madrone trees for firewood from the southwest and south-central portion of the property. Defendant also testified on cross-examination, however, that "my lease says that I cannot cut timber and laurel is not timber." There is evidence that Paul Huff shared a similar definition of "timber." In addition, the record discloses that defendant was authorized to clear portions of the southern part of the property. The testimony is in conflict, however, as to specifically what areas were permitted to be cleared.

In support of the allegation of breach in regard to the fir, pine and cedar, plaintiffs rely on the testimony of Paul Huff that he counted ninety-seven stumps of douglas and white fir trees greater than seven inches in diameter which were cut and removed after the lease was executed on October 14, 1970. In addition, plaintiffs contend the evidence shows that although logging operations prior to that date had left the equivalent of one truckload of "down" timber on the ground, defendant had five truckloads of timber hauled off the property.

Defendant, on the other hand, denied cutting any live fir or pine trees for timber, although he did admit cutting down dead ones and also cutting some live "poles" (smaller trees defendant was authorized to cut for fencing purposes). Defendant also offered the testimony of the logger who hauled off the five truckloads in August through December of 1971 to the effect that what was hauled was all "down timber" which by that time had been on the ground for approximately one and one-half years. It should be noted that the testimony of this logger that 4,000 to 4,400 board feet of timber were removed corresponds

[513]

with the testimony of the logger who cut the timber prior to the lease that approximately 4,000 board feet of timber had been left on the ground.

■ The trial court considered all such conflicting testimony and concluded that plaintiffs' allegations of breach in regard to the trees had "not been substantiated." After reviewing the record, we agree with that finding.

### 2. Water rights.

The circumstances surrounding the issue of water rights are somewhat complicated. According to plaintiffs' brief, in June of 1971 Paul Huff explained the water rights situation to defendant as follows:

> "He [Mr. Huff] told Mr. Bretz and Mr. Brewster that the water was supposed to come from Williams Creek out of his diversion through the east side ditch, which was a privately owned ditch. [Note that Mr. Huff's designated point of diversion on the east side ditch was not located on his own property]. He explained that he had lost his lateral ditch across the neighbor's [Mr. Hyde's] land connecting to the east side ditch, and for many years had pumped out of the East Fork of Williams Creek at a different point [which point was located on his own property] in order to protect his water right. He said that he had recently negotiated with his neighbor, Mr. Hyde, to reestablish his connecting ditch across Hyde's property * * *."

For various reasons, the lateral ditch across Mr. Hyde's property to plaintiffs' designated point of diversion on the east side ditch was not reestablished. For that reason, plaintiffs told defendant to pump from the East Fork of Williams Creek where it crossed the property, as plaintiffs had previously done. Defendant did not do this. In August of 1975 the Water Resources Director of the State of Oregon found that as no beneficial use of the water under the water right had been made for a five-year period from 1970 to 1975, the water right had been forfeited.

[514]

Plaintiffs contend that the lease requires defendant to "make beneficial use of all the water rights appurtenant to said land"; that defendant failed to do so, and that as a result valuable water rights appurtenant to the property were terminated. Plaintiffs state that had defendant done as he was directed and pumped water from the East Fork of Williams Creek, that use, though not from plaintiffs' designated point of diversion, would have preserved the water rights (citing In re Matter of Water Right of Miller, Vol. 9, Special Order Record of State Engineer, p. 63 (1958)).[3] Plaintiffs contend that by failing to do so defendant has breached the lease.

Defendant admits that he made no beneficial use of the water right in question. He states, however, that the only lawful point of diversion for that water right was from the east side ditch; that plaintiffs had lost the use of the lateral ditch connecting that point of diversion and the property prior to the execution of the lease, and that ORS 540.510 prohibits a change in the point of diversion without compliance with certain statutory procedures. For these reasons, defendant contends that the lease "did not and could not require defendant to do an unlawful act," as by changing the point of diversion by pumping from a point other than the one designated, and that, as a result, there was no breach of the lease.

Plaintiffs counter with the contention that "[a]n agreement which conflicts with a statute is not necessarily void," citing the leading case of *Uhlmann v. Kin Daw*, 97 Or 681, 689-90, 193 P 435 (1920).

In *Uhlmann*, this court stated that:

"* * * An agreement is illegal if it is contrary to law, morality or public policy: 6 R.C.L. 693. Plain examples of illegality are found in agreements made in violation of some statute; and, stating the rule

---

[3] We will assume, for purposes of this opinion only, that such a statement is correct.

broadly, an agreement is illegal if it violates a statute or cannot be performed without violating a statute."

"* * * * *"

"The rule that an agreement is illegal and unenforceable if it conflicts with the provisions of a statute is not inexorable and unbending. * * *"

We also noted that:

"* * * The inquiry is as to the legislative intent, and that may be ascertained, not only by an examination of the express terms of the statute, but it may also be implied from the several provisions of the enactment. Of course, if a statute expressly declares that an agreement made in contravention of it is void, then the inquiry is at an end; but, in the absence of such a declaration, the court may take the statute by its four corners and carefully consider the terms of the statute, its object, the evil it was enacted to remedy, and the effect of holding agreements in violation of it void, for the purpose of ascertaining whether it was the legislative intent to make such agreements void * * *."

In *Hunter v. Cunning*, 176 Or 250, 287, 154 P2d 562, 157 P2d 510 (1945), we summarized the holding in *Uhlmann* as follows:

"* * * We derived therefrom the fundamental distinction between the Uhlmann case and the case at bar, viz., that the rule, which avoids a contract made in contravention of a statute, will *always* be applied when the statute is intended for the protection of the public against those evils which we know from experience society must be guarded against by protective legislation. The statute under consideration is such a one." (Emphasis in original)

The issue of the validity of agreements in contravention of statute was more recently discussed in *Bronson v. Moonen*, 270 Or 469, 478-81, 528 P2d 82 (1974). After quoting from both *Uhlmann* and *Hunter*, the court in *Bronson* concluded that the administrative rule violated in that case was "for the protection of the public," and therefore held that the contract made in violation of that rule was at least voidable, if not void.

[516]

■ We conclude that the Oregon statutes relating to water rights, including the statutory provisions involved in this case, were enacted "for the protection of the public."[4] ORS 540.510 provides that:

> "All water used in this state for any purpose shall remain appurtenant to the premises upon which it is used and no change in use or place of use of any water for any purpose may be made without compliance with the provisions of ORS 540.520 and 540.530. However, the owner of any water right may, *upon compliance with the provisions of ORS 540.520 and 540.530,* change the use and place of use, *the point of diversion* or the use theretofore made of the water in all cases without losing priority of the right theretofore established." (Emphasis added)

ORS 540.520 provides that whenever the owner of a water right desires to change his point of diversion, an application to make such change "*shall* be filed with the Water Resources Director" (emphasis added), which application is to contain certain information. Upon receipt of the application,

> "* * * the director shall give notice by publication in a newspaper printed and having general circulation in the county in which the water rights are located, for a period of at least three weeks and not less than one publication each week. The published notice shall set forth the time and place when a hearing shall be had upon the application; provided, that the date fixed for such hearing shall be not less than 30 days after the last publication of the notice. The hearing shall be had in the county where the rights are located."

---

[4] In a footnote, the court in *Bronson* (at 479) cited other Oregon cases in which contracts made in violation of statutes enacted "for the protection of the public" were held void. One of these cases was *In re Water Rights of Willow Creek*, 119 Or 155, 207, 236 P 487, 236 P 763, 237 P 682, 239 P 123 (1925). In that case, the statutory provisions involved were O.L. §§ 5716 and 5717(2) (1920) of Title XXXIII, Of The Use of Water, which provided that a vested right to appropriate water was created only to the extent of actual prior application to beneficial use. The court held that the riparian proprietor could not lawfully contract to deliver water to exceed the extent of that vested right.

Any person having objections to the proposed change as set forth in the public notice "shall file his objections with the director" at least ten days prior to the date set for the hearing. If no objection is filed, the director may approve the change without a hearing.

ORS 540.530(1) provides that:

> "At the time fixed for the hearing, if objections are filed, the Water Resources Director or his authorized assistant shall hear and determine the same. The proceedings shall be summary and informal, but witnesses may be called and testimony taken. *If, after hearing or examination, the Water Resources Director finds that the proposed change can be effected without injury to existing rights,* he shall make an order approving the transfer and fixing a time limit within which the application of water may be made to the new use." (Emphasis added)

Although ORS 540.510 et seq. do not *expressly* prohibit the changing of one's point of diversion without making application to the Water Resources Director, we believe that it is clearly implied from these provisions that a person shall *not* change his point of diversion *unless* he files such an application and complies with the procedures set forth in ORS 540.520 and 540.530. These procedures are "for the protection of the public" (more specifically, for the protection of the interests of those who own affected or potentially affected water rights) against the evil of unrestrained changes in the point of diversion of water. This legislative purpose would be frustrated if a party could be required under the terms of an agreement to pump from an unauthorized point of diversion—thereby changing the point of diversion without complying with the procedures mandated by ORS 540.510 et seq—and be held in breach of that agreement if he did not do so.

For these reasons, a lease provision specifically requiring defendant to pump from the East Fork of Williams Creek may well have been voidable and thus unenforceable. Here, however, the lease contained no

such specific requirement. The lease merely required defendant to "make beneficial use of all the water rights appurtenant to the property." Plaintiffs seek to read this provision to require that defendant pump water from the unauthorized point of diversion in order to save the water right. For the reasons stated above, we hold that this lease provision cannot properly be interpreted and enforced in such a manner as to require defendant to commit an act in violation of ORS 540.510 et seq. by pumping out of the East Fork of Williams Creek. It follows that plaintiffs have not established that defendant breached the lease provision in which he agreed to "make beneficial use of all the water rights appurtenant" to the property.

■ The trial court concluded that the water right had been lost *prior* to the execution of the lease, and that defendant had not breached the lease by failing to make beneficial use of such water right for that reason. The evidence does not support that finding, and both parties disclaimed that reasoning at oral argument before this court. However, when it appears from the record that the trial court arrived at a correct result, but on grounds different than those which, in our opinion, are more proper as the basis for such a result, the judgment of the trial court may be affirmed. *See State Farm Fire v. Sevier*, 272 Or 278, 298, 537 P2d 88 (1975).

### 3. Topsoil.

■ Plaintiffs contend that defendant removed the topsoil from approximately two and one-half acres of the property, exposing the granite substrata and rendering that land useless for agricultural purposes. The evidence is in conflict, however, as to whether the plaintiffs, in agreeing to defendant's suggestion that this land be leveled, were specific about the method by which this was to be done. Paul Huff testified that he gave specific instructions as to the topsoil. Defendant testified that he did not recall Mr. Huff mentioning anything about the topsoil before the leveling took

place, and that if Mr. Huff did say anything about the method of leveling to be used, "he just wasn't specific about it * * *." Defendant also testified that since the leveling took place the land in question has produced a healthy crop of oats.

The trial court found that "the leveling was part of a long range plan for the improvement of the premises," as required by the lease. Given the particular facts and the conflict in the testimony, we agree with the trial court that plaintiffs failed to prove a breach of the lease under this allegation.

### 4. Other allegations of breach.

As previously noted, plaintiffs also allege that defendant breached the lease by subletting the ranch house, by destroying a well, by failing to maintain the perimeter fences and the leased farm equipment, and by failing to develop the pasture lands and to farm the property in accordance with practices of good husbandry. We have reviewed the record and agree with the finding of the trial court that plaintiffs failed to prove a breach of the lease under any of these allegations. It would serve no useful purpose to state or summarize all of the conflicting evidence.

For these reasons, we conclude that the trial court did not err in finding that plaintiffs had not established that defendant breached the lease as alleged in plaintiffs' complaint.[5]

*The trial court did not err in ordering plaintiffs to specifically perform the purchase option provision in the lease.*

Because there was no breach of the lease, it was still in full force and effect at the time defendant attempted to exercise his purchase option on April 7,

---

[5] For this reason, we need not reach defendant's contentions that plaintiffs waived any breach of the lease or were estopped from terminating the lease.

1975.[6] In plaintiff's second assignment of error, however, it is contended that defendant did not properly exercise that option. Plaintiffs state that defendant's letter of April 7 was insufficient as an exercise of the option because there was no tender of performance.

The lease provides that:

"At any time during the period of this lease, the lessees may notify the lessors of their intention to exercise the option to purchase as herein provided by mailing a notice to the lessors by registered or certified mail, with return receipt requested."

The lease also provides that within thirty days following such written notice, the lessors shall "order a standard policy of title insurance, and shall furnish the lessees with a preliminary title report" to the property. Upon receipt of such title report, the lessees shall pay the lessors $15,000, and "the parties shall execute and enter into a conditional sales contract."

During the term of this lease, defendant sent plaintiffs a letter by certified mail dated April 7, 1975, in which defendant stated:

"Pursuant to Paragraph XI of the Lease * * * you are hereby notified that I intend to exercise the option set forth in Paragrph XI(a) to purchase the property described in said Lease on the terms set forth in Paragraph XI."

The letter then set forth the sequence of events that was to follow under the terms of the lease as a consequence of that letter of notification. Plaintiffs did not respond to this letter by ordering title insurance and furnishing defendant with a preliminary title report.

We conclude that defendant exercised his purchase option in accordance with the terms of the lease, and that the trial court did not err in ordering plaintiffs to

---

[6] We therefore need not decide plaintiffs' contention that the purchase option would terminate with the lease, nor defendant's contention that it would survive independently of the lease.

specifically perform the purchase option provision of the lease. [7]

*The counterclaim.*

Plaintiffs' third assignment of error is that the trial court erred in entering judgment against plaintiffs on defendant's counterclaim.

Defendant's counterclaim is divided into two counts. Count I alleges that during defendant's occupancy of the leased premises "plaintiffs and defendant agreed that the building on said property needed a new roof"; that "[p]laintiffs and defendant agreed to equally share the cost of the new roof"; that one half of the reasonable cost of the new roof is $235, and that plaintiffs have refused to pay such sum and are therefore indebted in that sum to defendant.

Count II alleges that during defendant's occupancy of the leased premises "the water pump and water heater both had to be replaced," that "[t]he reasonable cost of said heater and pump was the sum of $160," and that "plaintiffs are indebted to the defendant in the sum of $160 which sum they have failed and refused to pay."

In regard to Count I, defendant testified that the agreement to share the cost of the new roof was an oral agreement made during the term of the lease. Plaintiff Paul Huff denied the making of such an agreement. The trial court, after receiving this conflicting testi-

---

[7] In this regard, the following comment of the trial judge deserves mention:

"Throughout the case the Court gained the impression that the Plaintiffs feel that because of the great increase in value of real property in this area they would like to have the property back and have seized upon a multitude of minimal complaints to try to accomplish that purpose. Some of the testimony was very strained * * *. The Defendant has never defaulted in payments and even after Plaintiffs refused to accept them, the payments were tendered into court and await disposition by Plaintiffs. By completing the lease and option the Plaintiffs will be receiving the full amount bargained for and it will matter not at all that the Defendant has not performed in the manner desired by Plaintiffs but not required by the terms of the lease."

mony, found in favor of defendant. Because we give substantial weight to the findings of the trial court where, as here, the credibility of the witnesses is of great importance, we agree with the finding of the trial court that defendant is entitled to recover $235 on Count I of his counterclaim.

As to Count II, defendant has suggested no legal theory under which he would be entitled to recover the $160 he allegedly paid for a new water pump and heater. Defendant's only contention is that "plaintiffs' pleadings contain no denial of defendant's counterclaim and therefore are admitted by plaintiff." After examining plaintiffs' pleadings, we conclude that if plaintiffs' denial of defendant's counterclaim was not technically sufficient, defendant waived any such defect by introducing evidence at trial on the counterclaim and by failing to make objection when plaintiffs introduced such evidence. We also conclude, after reviewing the record, that although defendant has established that he is entitled to recover $235 under Count I of his counterclaim, he has failed to carry his burden of proof that he is entitled to recover the additional $160 awarded by the trial court under Count II of his counterclaim.

*The cross-appeal.*

Defendant cross-appeals from the trial court's denial of his claim for damages on his "cross complaint" for misrepresentation. The essence of that cross complaint is that "[p]laintiffs represented that there were certain valuable and valid water rights appurtenant to the property," that plaintiffs "had allowed said water rights to lapse by non-use thereof," and that the "owners of adjacent property [the Hydes] across whose property the plaintiffs represented they had an easement for conveyance of the water refused to allow defendant to transport said water across said property."

Plaintiffs contend, however, that there is no evidence in the record that *any* representation about

[523]

water rights was made by plaintiffs to Mr. Brewster or defendant prior to the execution of the lease on October 14, 1970. In addition, plaintiffs contend that in the spring of 1971, when Mr. Huff admittedly talked with the lessees about the water rights and the lateral ditch across Mr. Hyde's property, plaintiffs *did* have a valid water right and an agreement with Mr. Hyde. We agree.

The only representation in evidence that appears to have been made in regard to water rights prior to the execution of the lease is found in the lease itself, which states that lessees agree to "make beneficial use of all the water rights appurtenant to said land." At the time of the execution of the lease there *were* such rights, because the water rights were not terminated until August 6, 1975. In addition, defendant offered no evidence that plaintiffs did not have an agreement for the conveyance of water with Mr. Hyde at the time of the discussions in 1971, as plaintiffs testified.

The trial court concluded that defendant should be denied recovery on his claim of misrepresentation because "[d]efendant did nothing during the course of the term of the lease to preserve any rights which might have been available thereunder and thus mitigate his damage." We choose instead to rest our decision on our finding that defendant failed to prove his action for damages based on plaintiffs' alleged misrepresentations because he failed to prove that any misrepresentations were made. *State Farm Fire v. Sevier, supra,* 272 Or at 298.

For all these reasons, the judgment and decree of the trial court is affirmed, as modified to reduce the sum awarded to defendant on his counterclaim to $235, with costs to neither party.