Argued and submitted May 25, affirmed on appeal and on cross-appeal September 14, petition for review denied December 27, 1994 (320 Or 493)

John S. LOEWEN,
Leland S. Loewen, Charles Altorfer
and Richard A. Dick,
*Appellants - Cross-Respondents,*

H. Elvira LOEWEN,
Amy B. Loewen, Trustee of the
Amanda Rose Loewen Trust,
Alice Loskot, as Successor-in-Interest
to Kenneth W. Loskot,
Louise Altorfer,
*Appellants,*

*v.*

E. B. GALLIGAN,
Anthony J. Bosboom, R. Keith Douglas,
John H. Geiger, Louis B. Perry,
Roland W. Kueber, A. M. Gleason,
Pacific Telecom, Inc.,
a Washington corporation,
Ford Aerospace Corporation,
a Michigan corporation,
American Network, Inc.,
an Oregon corporation,
ITT Corporation,
a Delaware corporation, and
United States Transmission Systems, Inc.,
a Delaware corporation,
*Respondents - Cross-Appellants,*

*and*

Michael HOLMSTROM,
Ben Agee, C.P. National Corporation,
a California corporation,
*Defendants.*

(A9005-02822; CA A77913)

882 P2d 104

■■■■■■■■■■■■■■

Frederick T. Smith argued the cause for appellants and appellants - cross-respondents. With him on the briefs were Christopher H. Kent, Nicholas I. Goyak and O'Connell, Goyak & DiLorenzo.

Stephen L. Griffith argued the cause for respondents - cross-appellants. With him on the briefs were Joyce Ann Harpole, Stoel Rives Boley Jones & Grey, Mark A. Turner, Ater Wynne Hewitt Dodson & Skerritt, Jill S. Gelineau and Schwabe, Williamson & Wyatt.

Before Warren, Presiding Judge, and Edmonds and Landau, Judges.

WARREN, P. J.

## WARREN, P. J.

Plaintiffs appeal from a judgment dismissing claims in their first and second amended complaints that alleged breach of fiduciary duty, negligence and violations of the Oregon Racketeer Influenced and Corrupt Organization Act, ORS 166.715 to ORS 166.735 (ORICO). ORCP 21 A(8). They also appeal from a summary judgment on their third amended complaint, which alleged claims for securities fraud, common law fraud and breach of contract.[1] ORCP 47 C. Defendants[2] cross-appeal the trial court's denial of their motion for expenses pursuant to ORCP 46 C. We affirm on the appeal and on the cross-appeal.

We assume the truth of the facts pleaded in the first and second amended complaints and view the evidence that was before the trial court on summary judgment in the light most favorable to plaintiffs. *Madani v. Kendall Ford, Inc.,* 312 Or 198, 201, 818 P2d 930 (1991); *Seeborg v. General Motors Corporation,* 284 Or 695, 700, 588 P2d 1100 (1978).

This case involves a series of corporate transactions in which plaintiffs lost money that they had invested in defendant American Network, Inc. (AmNet), a long distance telecommunications company. In March, 1984, defendant Pacific Telecom, Inc. (PTI) became the controlling shareholder of AmNet, which was a potential competitor. In October, 1984, PTI and plaintiff John Loewen (Loewen), the majority shareholder and chief executive officer of SaveNet, a long distance telecommunications company that competed with AmNet, entered into a share voting agreement that caused AmNet to merge with SaveNet (the AmNet/SaveNet merger). At that time, AmNet stock was trading for about $4 per share. At about the same time, PTI made a proposal to another telecommunications company, C.P. National Corporation (CPN). That proposal provided, in part, that PTI would cause AmNet to purchase certain CPN assets in exchange for AmNet shares valued at current market price. Later, CPN agreed to invest a minimum of $2 million in

---

[1] The breach of contract claim was asserted only by plaintiff John Loewen.

[2] Plaintiffs have stipulated to the dismissal of all claims against defendants C.P. National Corporation, Ben Agee and Michael Holmstrom, and they are not parties on appeal.

AmNet in exchange for an instrument that CPN could covert into shares of AmNet common stock (the CPN/AmNet transaction).

In November, 1984, AmNet sent its shareholders a proxy statement that purported to describe the AmNet/ SaveNet merger. The statement disclosed that PTI controlled a majority of voting shares and that it intended to vote for the merger. Next, the statement disclosed that a debt that AmNet owed to PTI would be canceled in exchange for AmNet convertible preferred stock (the PTI/AmNet transaction). The statement also indicated that CPN would receive AmNet convertible preferred stock in exchange for assets and $2 million.[3] AmNet shareholders approved the merger in March, 1985. The PTI/AmNet and the CPN/AmNet transactions did not require shareholder approval.

After the merger, the value of AmNet's stock declined. It began reporting substantial quarterly losses. In 1986, AmNet began negotiations with defendant Ford Aerospace Corporation (Ford) to acquire Ford's subsidiary telecommunications company, Starnet. During AmNet's annual shareholders meeting in July, 1986, defendant Galligan, who was the chief executive officer of AmNet, said that the proposed Starnet acquisition would improve AmNet's net worth. In September, 1986, Ford invested $20 million in AmNet in exchange for stock. AmNet acquired the assets and liabilities of Starnet (the Starnet acquisition). AmNet, however, continued to lose money and its share price declined.

Loewen[4] became concerned about the way AmNet was being managed. In October, 1986, Loewen wrote to Galligan and accused him of making misleading statements. In December, 1986, an AmNet shareholder filed a lawsuit in federal court against AmNet and several of the defendants in this case, alleging securities law violations and breach of fiduciary duty in the 1984 AmNet/SaveNet merger, the CPN/ AmNet transaction and the PTI/AmNet transaction. In June, 1987, other shareholders joined in that lawsuit. *See Guenther v. Pacific Telecom, Inc.*, 123 FRD 333 (D Or 1988). AmNet's

---

[3] The purported value of the assets to be acquired by AmNet was not disclosed in the proxy statement.

[4] Loewen became a director of AmNet after the merger. Later, he resigned.

financial condition continued to deteriorate throughout 1987. Late in 1987, AmNet proposed that defendant ITT Corporation (ITT) buy AmNet outright. In December, 1987, other shareholders filed a second lawsuit against AmNet and several defendants in this case, alleging, in part, claims similar to those in *Guenther. See Numrich v. Gleason*, 700 F Supp 512 (D Or 1988). In February, 1988, ITT agreed to purchase AmNet in a cash-out merger (the ITT merger). Most of AmNet's shareholders received 25 cents per share.[5]

In May, 1990, plaintiffs brought this action, alleging breach of fiduciary duties, ORICO violations and securities fraud in connection with the ITT merger. Plaintiffs filed an amended complaint in October, 1990, which added allegations about the AmNet/SaveNet merger, the PTI/AmNet and CPN/AmNet transactions and the Starnet acquisition. The trial court dismissed plaintiffs' direct claims for breach of fiduciary duty, negligence and violations of ORICO, concluding that plaintiffs had alleged only derivative injuries. Plaintiffs then filed a second amended complaint, asserting derivative claims based on those theories. The trial court also dismissed those claims, concluding that, because plaintiffs no longer owned AmNet stock, they lacked standing to assert those claims. Plaintiffs filed a third amended complaint, alleging violation of Oregon securities laws, fraud and breach of contract. Defendants moved for summary judgment, and the court granted it. Plaintiffs assign error to the dismissal of their direct and derivative claims and to the grant of summary judgment on their claims in the third amended complaint.

## MOTIONS TO DISMISS

■ Plaintiffs first assign error to the trial court's dismissal of their direct and derivative claims for breach of fiduciary duty, negligence and violations of ORICO, which were contained in plaintiffs' first and second amended complaints. Those claims were dismissed with prejudice. In reviewing the granting of a motion to dismiss, we accept all well-pleaded allegations as true and give plaintiffs the benefit of all favorable inferences that may be drawn from the facts alleged. *Madani v. Kendall Ford, Inc., supra*, 312 Or at 201.

---

[5] As part of the agreement, PTI and Ford received nothing for their shares. CPN agreed to receive 10 cents per share.

■ Plaintiffs, relying on *Noakes v. Schoenborn*, 116 Or App 464, 841 P2d 682 (1992), and *Chiles v. Robertson*, 94 Or App 604, 767 P2d 903, *mod* 96 Or App 658, 774 P2d 500, *rev den* 308 Or 592 (1989), argue that, when minority shareholders have been defrauded, those shareholders have standing to assert direct claims for breach of fiduciary duty and negligence. Defendants contend that, if the only injury alleged by a shareholder is a diminution of share value, the claim is derivative.[6] The general rule is that a shareholder may not assert a direct claim against directors or officers who have defrauded or mismanaged a corporation if the only alleged injury is a diminution of stock value. *Smith v. Bramwell*, 146 Or 611, 615, 31 P2d 647 (1934). If, however, a shareholder has a "special" injury, then the shareholder has standing to assert a direct claim. A special injury is established where there is a wrong suffered by the shareholder not suffered by all shareholders generally or where the wrong involves a contractual right of the shareholders, such as the right to vote. 146 Or at 616-19; *Wilcox v. Stiles*, 127 Or App 671, 680, 873 P2d 1102 (1994). *See also Jones v. H.F. Ahmanson & Co.*, 1 Cal 3d 93, 81 Cal Rptr 592, 460 P2d 464 (1969); 12B Fletcher, *Cyc Corp* § 5913 (Perm ed 1993).

Here, plaintiffs alleged that defendants committed numerous breaches of fiduciary duty. Plaintiffs argue that *Noakes v. Schoenborn, supra*, and *Chiles v. Robertson, supra*, stand for the proposition that minority shareholders can assert direct claims for breach of fiduciary duty. In *Chiles*, we recognized that directors and majority shareholders owe a fiduciary duty to minority shareholders. 94 Or App at 618. We did not, however, discuss the circumstances under which a minority shareholder has standing to assert a direct claim for breach of fiduciary duty or whether a breach of fiduciary duty, by itself, gives rise to a direct cause of action. In *Noakes*, we discussed an exception to the general rule that a claim alleging a wrongful act by corporate directors or majority shareholders that diminished the value of stock must be brought derivatively. We said that minority shareholders in a *closely held* corporation could bring

---

[6] Defendants also argue that any direct, derivative or ORICO claims based on the AmNet/SaveNet merger, the CPI/AmNet transaction, the PTI/AmNet transaction, Starnet acquistion and some claims based on the ITT merger, are time barred. However, below, defendants did not argue that those claims were time barred. We will not address that issue for the first time on appeal.

a direct action when they had alleged that the actions taken by the majority shareholders had breached fiduciary duties to the minority shareholders. 116 Or App at 470.

Plaintiffs argue that we should apply that exception here, even though AmNet was not a closely held corporation. They contend that we should adopt the analysis in *Weinberger v. UOP, Inc.*, 457 A2d 701 (Del Supr 1983), *Cede & Co. v. Technicolor, Inc.*, 634 A2d 345 (Del Supr 1993), and *In re Tri-Star Pictures, Inc., Lit*, 634 A2d 319 (Del Supr 1993). In each of those cases, minority shareholders alleged a breach of fiduciary duty by shareholders or directors of publicly traded companies. Neither *Weinberger* nor *Cede* examine the circumstances under which minority shareholders of a publicly held corporation have standing to assert a direct claim for breach of fiduciary duty. That issue, however, was discussed in *Tri-Star Pictures*.

In *Tri-Star Pictures*, the Delaware Supreme Court reversed a summary judgment against the plaintiffs, who were former minority shareholders of Tri-Star Pictures, Inc. (Tri-Star). The plaintiffs asserted direct claims against corporate and individual defendants, alleging that numerous breaches of fiduciary duty had occurred in a series of transactions between Tri-Star and the Coca-Cola Company. The defendants sought dismissal, arguing that the complaint alleged only a waste of corporate assets, which precluded the plaintiffs from bringing any direct claims. The Delaware Supreme Court disagreed, concluding that the plaintiffs had sufficiently alleged a special injury *beyond a diminution of share value*. 634 A2d at 327.

Here, plaintiffs have adequately pleaded breach of fiduciary duty. After carefully reviewing plaintiffs' allegations and the reasonable inferences that can be drawn from them, however, we conclude that the only injury they allege is the loss in value of their investments in AmNet.[7] A "wrongful

---

[7] At oral argument, counsel for plaintiffs contended that defendants had benefited from the transactions that culminated in ITT's purchase of AmNet. Paragraph 143 of plaintiffs' first amended complaint alleges:

"PTI directly received benefits from AmNet by receiving shares far below low market value and the lease of equipment to AmNet. CPN realized direct benefits through the sale of an unprofitable division, Command Central and the acquisition of shares of less than their real value. Ford Aerospace realized direct

act that diminishes the value of stock and thereby injures shareholders only indirectly, by reason of the prior injury to the corporation, is derivative." *Noakes v. Schoenborn, supra*, 116 Or App at 471. Because plaintiffs have not pleaded a special injury, we conclude that the claims they allege are derivative, and they do not have standing to bring direct claims for breach of fiduciary duty. *See Smith v. Bramwell, supra*; American Law Institute, *Principles of Corporate Governance* § 7.01, *comment c* and Reporter's Note H (1992).

■■ Plaintiffs next argue that the trial court erred in dismissing their claim for negligence against defendants Bosboom, Douglas and Perry. That claim alleges, in part:

> "These Defendants were negligent in one or more of the following particulars:
>
> "In negotiating and approving the [ITT] Exchange Agreement, the individual Defendants, directors of AmNet, breached their fiduciary obligations to Plaintiffs in one or more of the following particulars:
>
> "(a) That the directors failed to obtain a fair price for the sale of AmNet.
>
> "(b) That the directors failed to obtain an independent evaluation of the fairness of the transaction.
>
> "(c) That the directors had conflicts of interest that they failed to disclose."

The gist of those allegations is that defendants breached fiduciary obligations owed to plaintiffs. Whether defendants "negligently" breached those duties is irrelevant in determining whether plaintiffs may recover for a breach of fiduciary duty. *See Noakes v. Schoenborn, supra*, 116 Or App at 472. We have already concluded that plaintiffs do not have standing to bring a claim for breach of fiduciary duty.

■ Plaintiffs next argue that the court erred in dismissing their ORICO claims, because it concluded that

---

benefits from the sale of its unprofitable subsidiary. ITT directly profited by acquiring a $34 million tax loss for $2 million, plus additional AmNet assets which it, in turn, sold for a profit. Defendants Gleason, Geiger, Galligan, Holmstrom and Agee individually profited from the payment of salaries, bonuses and benefits by their respective companies."

Plaintiffs argued that, because plaintiffs had not similarly benefited, they had sustained a "special" injury sufficient to maintain their direct claims. Plaintiffs have cited no authority, and we have found none, to support that argument.

those claims were derivative and that, therefore, plaintiffs lacked standing to bring them.[8] ORICO is silent about shareholder standing to assert claims and no Oregon cases address that issue. The ORICO statute was enacted in 1981 and was modeled after the federal Racketeer Influenced and Corrupt Organization Act, 18 USC §§ 1961 to 1968 (RICO). *State v. Blossom*, 88 Or App 75, 78, 744 P2d 281 (1987), *rev den* 305 Or 22 (1988). Therefore, cases interpreting federal law are persuasive in interpreting the similar Oregon statute. *See Redmond Ready-Mix, Inc. v. Coats*, 283 Or 101, 110, 582 P2d 1340 (1978); *State v. Blossom, supra*, 88 Or App at 79.

■ ORS 166.720, on which plaintiffs' ORICO claim is substantively based, contains language analogous to 18 USC § 1962. Those circuits that have considered the issue of shareholder standing to assert RICO claims are unanimous in holding that a shareholder does not have standing to assert those claims if the alleged injury is derivative of harm to the corporation. *See Roeder v. Alpha Industries, Inc.*, 814 F2d 22, 29-30 (1st Cir 1987); *Rand v. Anaconda-Ericson, Inc.*, 794 F2d 843, 849 (2d Cir 1986), *cert den* 479 US 987 (1986); *Crocker v. Federal Deposit Insurance Corp.*, 826 F2d 347, 349 (5th Cir 1987), *cert den* 485 US 905 (1988); *Warren v. Manufacturers Nat. Bank of Detroit*, 759 F2d 542, 545 (6th Cir 1985); *Carter v. Berger*, 777 F2d 1173, 1175 (7th Cir 1985); *Sparling v. Hoffman Const. Co., Inc.*, 864 F2d 635, 640-41 (9th Cir 1988). In each of those circuits, the courts look to general corporate law to determine whether a claim is direct or derivative. If a claim is derivative, the aggrieved shareholder has no standing to bring a RICO claim.

■ We find those cases to be persuasive. Here, the only injury that plaintiffs' ORICO claims allege is a diminution in share value that affected all shareholders.[9] Because that

---

[8] Plaintiffs purport to quote *Computer Concepts v. Brandt*, 310 Or 706, 720, 801 P2d 800 (1990), as saying that "ORICO has no standing requirement and has specifically been interpreted to provide individual victims with a remedy." Neither that language nor any similar statement appears in *Computer Concepts*.

[9] *See* note 7, *supra*.

injury is derivative, we conclude that plaintiffs do not have standing to bring their ORICO claims.[10]

Plaintiffs next contend that the court erred in dismissing their derivative claims for breach of fiduciary duty, negligence[11] and violations of ORICO. Although there are no statutes governing standing in a derivative action, "general principles of standing require that, in order to bring a derivative suit, a shareholder must own stock at the time of the alleged wrong and retain ownership for the duration of the litigation." *Metal Tech Corp. v. Metal Teckniques Co.*, 74 Or App 297, 302, 703 P2d 237 (1985). Here, plaintiffs no longer own stock in AmNet, because ITT purchased it. Notwithstanding the general rule, plaintiffs, relying on *Noakes v. Schoenborn, supra*, argue that "[t]here is no continuing interest requirement where the majority shareholders were involved in the wrongdoing."

In *Noakes*, we discussed exceptions to the general rule. The principal exceptions have been codified by the American Law Institute in *Principles of Corporate Governance* (1992) (the *Principles*). Oregon courts have found earlier drafts of the *Principles* useful in resolving other questions of corporate governance. *See Klinicki v. Lundgren*, 298 Or 662, 681, 695 P2d 906 (1985); *Chiles v. Robertson, supra*, 94 Or App at 620. Section 7.02(a) of the *Principles* provides the rules governing standing to commence and maintain a derivative suit:

"A holder of an equity security has standing to commence and maintain a derivative action if the holder:

"(1) Acquired the equity security either * * * before. the material facts relating to the alleged wrong were publicly disclosed or were known by, or specifically communicated to, the holder * * *;

"(2) Continues to hold the equity security until the time of judgment, unless the failure to do so is the result of corporate action in which the holder did not acquiesce,

---

[10] Plaintiffs also argue that *National Organization for Women, Inc. v. Scheidler*, ___ US ___, 114 S Ct 798, 125 L Ed 2d 659 (1994), supports their argument that they have standing to bring ORICO claims. *Scheidler* does not address whether minority shareholders have standing to bring RICO claims.

[11] As in their direct claim for negligence, the gist of plaintiffs' derivative negligence claim is breach of fiduciary duty.

and either (A) the derivative action was commenced prior to the corporate action terminating the holder's status, or (B) the court finds that such holder is better able to represent the interests of the shareholders than any other holder who has brought suit[.]".

The issue is whether plaintiffs have sufficiently pleaded that they have standing to bring their derivative claims. *See Noakes v. Schoenborn, supra*, 116 Or App at 470. According to their complaint, plaintiffs no longer own AmNet stock. Therefore, to have standing to bring their derivative claims, they must plead facts that fit within one of the two exceptions in section 7.02(a)(2).[12] Even assuming that plaintiffs did not acquiesce in the sale of AmNet to ITT, they do not allege that they commenced this action before they sold their AmNet shares. Further, plaintiffs have not alleged, nor are we able to infer from the pleadings, that they are better able to represent the interests of the shareholders than any other holder who has brought an action against defendants. Therefore, they have not alleged that they are within the exceptions in section 7.02(a). We conclude that plaintiffs have not sufficiently pleaded that they have standing to assert their derivative claims. Plaintiffs' remaining arguments about standing do not require discussion. The trial court did not err in dismissing plaintiffs' direct and derivative claims for breach of fiduciary duty, negligence and violations of ORICO found in their first and second amended complaints.

## SUMMARY JUDGMENT

After the trial court dismissed plaintiffs' claims for breach of fiduciary duty, negligence and violations of ORICO, plaintiffs filed a third amended complaint, which has seven claims for relief. The trial court, on alternative grounds, granted defendants' motion for summary judgment on each of those claims. Plaintiffs make multiple assignments that the trial court erred in granting summary judgment. We will address those assignments by discussing each of plaintiffs'

---

[12] In *Noakes*, we held that the plaintiffs had standing to bring a derivative claim, because they had sufficiently pleaded that their failure to have a continuing interest was the result of corporate action in which they did not acquiesce *and* that they were better able than other stockholders to represent the interests of the corporation. 116 Or App at 470.

claims and the parties' arguments about whether the trial court's disposition of those claims was correct.

To prevail on its summary judgment motion, defendants must show that there is no genuine issue of material fact and that they are entitled to judgment as a matter of law. *Seeborg v. General Motors Corporation, supra*, 284 Or at 700. We state the facts that were before the trial court in the light most favorable to plaintiffs. 284 Or at 699.

### First Claim for Relief

We first discuss plaintiffs' assignment that the court erred in granting summary judgment on plaintiffs' first claim for relief, based on the expiration of the statute of limitations. The claim is by Loewen, plaintiffs Leland and Elvira Loewen and plaintiff Loskot, and is based on the 1984 AmNet/SaveNet merger, the PTI/AmNet transaction and the CPN/AmNet transaction. Those plaintiffs allege that AmNet is liable, as a seller, for securities fraud in violation of ORS 59.115(1)(b) and that all defendants except Ford, Kueber, ITT and its wholly-owned subsidiary, United States Transmission Systems, Inc. (USTS), are liable as controllers under ORS 59.115(3).

A person violates ORS 59.115(1)(b) if the person sells[13] a security by means of an untrue statement or omission of material fact. Under ORS 59.115(3), every person who directly or indirectly controls[14] a seller who is liable under ORS 59.115(1)(b) or who materially aids or participates in the sale is liable to the same extent as the seller. Because it is dispositive, we first address defendants' argument[15] that the first claim against all defendants except AmNet is "absolutely time barred" by the statute of limitations.[16]

---

[13] A sale includes "every contract of sale of, contract to sell, or disposition of, a security or interest in a security for value." ORS 59.015(15)(a).

[14] "Control" means the ability of a person to direct or cause the direction of the management and policies of another. ORS 59.015(2).

[15] The parties agree that AmNet was the seller of securities in the 1984 transactions. Plaintiffs do not argue that other defendants were sellers of securities in those transactions. Under ORS 59.115(6), actions involving a seller of securities may, under certain circumstances, be brought more than three years after the sale occurred.

[16] At trial, defendants made the same argument that they make here. The trial court agreed with defendants' argument and we base our decision on that argument. *See Huff v. Bretz*, 285 Or 507, 519, 592 P2d 204 (1979).

ORS 59.115(6) provides:

"Except as otherwise provided in this subsection, no action or suit may be commenced under this section more than three years after the sale. An action under this section for a violation of subsection (1)(b) of this section * * * may be commenced within three years after the sale or two years after the person bringing the action discovered or should have discovered the facts on which the action is based, whichever is later. Failure to commence an action on a timely basis is an affirmative defense."

The text of ORS 59.115(6) plainly provides that the statute of limitations for a violation of any subsection of ORS 59.115, other than ORS 59.115(1)(b), is three years. Therefore, plaintiffs had three years to bring their claim against defendants, except AmNet, alleging a violation of ORS 59.115(3).

■ Plaintiffs argue that their claim is timely because, under ORCP 32 O,[17] the statute of limitations is tolled upon the commencement of a class action. The last possible date that a sale of a security occurred involving the AmNet/SaveNet merger, the PTI/AmNet transaction and the CPN/AmNet transaction was March 20, 1985, when AmNet's shareholders approved the merger with SaveNet. Plaintiffs in the *Guenther* lawsuit, which was brought by other minority shareholders against AmNet and other defendants in this case, commenced a class action no earlier than June 5, 1987, more than two years after the sale. Class certification in *Guenther* was denied on August 2, 1988, and the statute of limitations began to run again. On May 9, 1990, more than one year and nine months later, plaintiffs filed their first complaint in this case. Therefore, even after tolling the statute of limitations and assuming every possible date in plaintiffs' favor, more than three years passed before they commenced this action. We conclude that plaintiffs' first claim against all of the defendants named in that claim,

---

[17] ORCP 32 O provides, in part:

"The statute of limitations is tolled for all class members upon the commencement of an action asserting a class action. The statute of limitations resumes running against a member of a class:

"* * * * *

"(3) * * * upon entry of an order * * * refusing to certify the class as a class action[.]"

except AmNet, is barred by the statute of limitations in ORS 59.115(6).

■■■■■ We next consider whether ORS 59.115(6) bars that part of plaintiffs' first claim that alleges AmNet is liable, as a seller, for securities fraud in violation of ORS 59.115(1)(b). Plaintiffs were required to bring their claim against AmNet no later than two years after they discovered or should have discovered the facts on which this action is based.[18] Assuming that the statute of limitations was tolled from June 5, 1987, to August 2, 1988, the issue is when plaintiffs discovered or, through reasonably diligent inquiry, should have discovered those facts. That is normally a question for the jury unless only one conclusion can reasonably be drawn from the evidence. *Mathies v. Hoeck*, 284 Or 539, 543, 588 P2d 1 (1978).[19] Whether plaintiffs should have known of the alleged securities violation depends on a two-step analysis. First, it must appear that plaintiffs had sufficient knowledge to call for an inquiry. Second, if plaintiffs had that knowledge, it must also appear that a reasonably diligent inquiry would disclose the securities violation. 284 Or at 543.

■■■■ Plaintiffs argue that, at the earliest, a reasonable person should have been on inquiry notice of the alleged securities violation no later than "late 1987 to 1988."[20] Defendants argue that plaintiffs were on inquiry notice well before late 1987, but contend that, at the latest, plaintiffs should have been on inquiry notice about the alleged securities violations during the pendency of the *Guenther* lawsuit.

---

[18] We have already concluded that, assuming every date in plaintiffs' favor, more than three years passed between the time of the sale and the commencement of this action.

[19] *Mathies* discussed the discovery rule found in ORS 12.110. Because the relevant inquiry is the objective meaning of "discovery," the discussion in *Mathies* of the discovery rule is equally applicable to ORS 59.115(6).

[20] Plaintiffs, in a footnote, argue that "there are many factual issues that would prevent applying that date at summary judgment." They cite to the deposition of Loewen for the proposition that he maintained that he did not know anything about the alleged fraud until sometime in 1989. Those portions of the deposition cited by plaintiffs do not support their argument, because Loewen did not say what plaintiffs claim. In that same deposition, however, Loewen testified that, sometime in the spring of 1988, he knew that there were two shareholder lawsuits pending against AmNet.

AmNet sent its shareholders of record quarterly and annual reports and shareholder communications. It sent persons on a special mailing list, including the Loewens, copies of AmNet press releases and SEC filings. By March, 1987, plaintiffs' investments in AmNet had plummeted by almost 70 percent. On June 9, 1987, the business section of *The Oregonian* published a story about the *Guenther* lawsuit. It was Loewen's practice to read that part of *The Oregonian*. Later that month, Galligan sent plaintiffs[21] a letter describing the allegations in the *Guenther* lawsuit. In July, 1987, AmNet sent proxy materials to plaintiffs that more fully described the claims in *Guenther*. It was Loewen's practice to review material that was received from AmNet. In August, 1987, he attended AmNet's annual shareholders' meeting. At that meeting, a confrontation occurred between Galligan, Guenther and other dissatisfied shareholders over the 1984 transactions.

In November, 1987, Loskot received and responded to an advertisement from a shareholder group called "The Committee to Restore Stockholder Value to American Network, Inc." It discussed the lawsuits that were pending against AmNet, its officers and directors and PTI. Plaintiff Altorfer received and read AmNet press releases. No later than February, 1988, Leland and Elvira Loewen had received and discussed a press release that explained the allegations in the *Guenther* and *Numrich* lawsuits.

After February, 1988, AmNet's losses continued until it merged with ITT in May, 1988. The proxy statement for that merger described in detail the *Guenther* and *Numrich* lawsuits. Loewen testified that he reviewed that statement. In June, 1988, Loewen attended a settlement conference in the *Numrich* and *Guenther* lawsuits. By August 2, 1988, the date that the class action in *Guenther* was decertified, plaintiffs no longer owned AmNet stock. They had lost more than 90 percent of their investments in AmNet. We conclude that by that time, at the latest, plaintiffs were or should have been aware of other shareholder lawsuits that asserted claims similar to those in this action.

---

[21] Plaintiff Amy Loewen relied on Loewen to make her investment decisions.

Further, sufficient facts on which to base this action could have been discovered through reasonable inquiry. The evidence is that, by mid-1985, AmNet records and documents filed with the Securities and Exchange Commission (SEC) contained most, if not all, of the facts on which this action is based. For example, an AmNet prospectus and an SEC form disclosed that CPN had received AmNet shares for $1 per share. Other documents revealed facts about the PTI/AmNet transaction and the AmNet/SaveNet merger that allegedly had been misrepresented in AmNet's 1985 proxy statement.

The only conclusion that reasonably can be drawn from the evidence in the summary judgment record is that plaintiffs discovered or should have discovered, through reasonably diligent inquiry, the facts on which this action is based no later than August 2, 1988. Therefore, plaintiffs had two years from August 3, 1988, to file their claim against AmNet.

■ The claims against AmNet that allege securities violations and common law fraud based on the 1984 transactions first appeared in plaintiffs' amended complaint, filed on October 17, 1990. Plaintiffs argue that those claims relate back to their original complaint, which was filed on May 9, 1990. Defendants disagree. Whether the claims relate back to the filing of plaintiffs' original complaint is determined by ORCP 23 C, which provides, in part:

> "Whenever the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, the amendment relates back to the date of the original pleading."

Plaintiffs' original complaint alleged claims based on the 1988 ITT merger. Plaintiffs, however, contend that it refers to the 1984 transactions, because it "expressly described various security law violations and specifically referenced the allegations of another shareholder action pending in federal court (*Numrich v. Gleason*) and incorporated the *Numrich* allegations as predicate acts for the ORICO claims." The only paragraph in the original complaint that refers to *Numrich* alleges:

> "Defendants have committed numerous other security law violations which are more fully described in *Numrich, et*

*al. v. Gleason, et al.*, United States District Court for the District of Oregon, Civil No. 88-140-MA. The *actions as described in this lawsuit* and the *Numrich* lawsuit constitute at least two (2) separate violations of ORS 59.135 (fraud in the sale of securities)." (Emphasis supplied.)

Plaintiffs did not specifically incorporate by reference or attach the *Numrich* complaint to their original complaint. *See Natkin & Co. v. H.D. Fowler Co.*, 128 Or App 311, 876 P2d 319 (1994). We cannot tell from the face of their complaint the transactions on which *Numrich* is based. Further, none of the allegations about securities law violations in plaintiff's original complaint refers to the 1984 transactions.

Because plaintiffs' original complaint alleged no facts about the 1984 transactions, there is an insufficient similarity or relationship between the claim asserted in that complaint and the claims in plaintiffs' amended complaint that are based on these transactions. We conclude that defendants would not have been able to discern from the original complaint that the existence of a claim against them based on the 1984 transactions was a possibility. *See Welch v. Bancorp Management Services*, 296 Or 208, 221, 675 P2d 172 (1983); *Evans v. Salem Hospital*, 83 Or App 23, 31, 730 P2d 562, *rev den* 303 Or 331 (1987). Therefore, the allegations against AmNet in plaintiffs' third amended complaint that are based on the 1984 transactions do not relate back to the original complaint and are barred by the statute of limitations in ORS 59.115(6). *See Caplener v. U.S. National Bank*, 317 Or 506, 857 P2d 830 (1993); *Allison v. Kleinman*, 126 Or App 298, 868 P2d 764 (1994). Plaintiffs' remaining arguments about their first claim do not require discussion.

### Fourth Claim for Relief

Because it raises identical issues, we next consider whether the trial court erred in granting summary judgment on plaintiffs' fourth claim for relief, based on the expiration of the statute of limitations. That claim is also based on the 1984 transactions. The Loewens and Loskot allege that all defendants except Kueber, Ford, ITT and USTS are liable for common law fraud in connection with those transactions.

The applicable statute of limitations is ORS 12.110(1), which provides, in part:

"An action * * * for any injury to * * * the rights of another * * * shall be two years, provided, that in an action at law based upon fraud or deceit, the limitation shall be deemed to commence only from the discovery of the fraud * * *."

The statute of limitations in ORS 12.110(1) begins to run when a plaintiff discovers or should have discovered the alleged fraud. *Mathies v. Hoeck, supra,* 284 Or at 542. Plaintiffs argue that, in claims alleging fraud, the statute of limitations begins to run from notice of the last act of fraud, which they contend occurred in mid-1988.[22] Plaintiffs do not explain what fraud occurred in mid-1988 that is related to the 1984 transactions. Assuming that they are referring to alleged continuing omissions or misrepresentations related to the 1984 transactions that occurred at the time of the ITT merger, we conclude that plaintiffs' claim for fraud based on those transactions is barred by the statute of limitations.

■■■■ The allegations in plaintiffs' fourth claim for fraud are essentially the same as those found in their first claim.[23] We have already concluded that plaintiffs discovered or should have discovered the facts on which the first claim was based no later than August 2, 1988. That conclusion is equally applicable to plaintiffs' fourth claim. Plaintiffs had two years from August 3, 1988, in which to file a claim alleging fraud based on the 1984 transactions. Plaintiffs' fourth claim is based on allegations about the 1984 transactions, which first appeared in their October 17, 1990, third amended complaint. For the same reasons that we discussed regarding the first

---

[22] Plaintiffs rely on *Nesbit v. McNeil,* 896 F2d 380 (9th Cir 1990), in which the plaintiff alleged that the defendant, a securities trader, had made excessive trades (churning) on her behalf, which caused her to lose money. The defendant argued that the plaintiff's claims were barred by the applicable federal statute of limitations. The court held that the plaintiff's claim was timely, because "[c]hurning is a unified offense which is identified only by an analysis of the entire history of a broker's management of an account." 896 F2d at 384. That is not the case here. Further, ORS 12.110(1) differs from the federal statute of limitations.

[23] The fourth claim adds an allegation against defendants Gleason and PTI. It asserts that the Loewen plaintiffs purchased AmNet stock because Gleason fraudulently promised SaveNet shareholders that PTI would provide funding to protect AmNet's solvency. In 1985, PTI told the officers of AmNet that it would no longer provide that funding. Plaintiffs did not make any arguments about that part of the fourth claim in their brief or at oral argument. There is, however, ample evidence in the record that the Loewen plaintiffs were on inquiry notice of the alleged misrepresentation about funding well before August 2, 1988.

claim, plaintiffs' fraud claim does not relate back to their original complaint and is barred by the statute of limitations in ORS 12.110(1).

## Second and Fifth Claims for Relief

■■■ We next consider whether the trial court erred in granting defendants' summary judgment on plaintiffs' second and fifth claims for relief. In the second claim, plaintiff Dick alleges that all defendants are liable for violations of Oregon securities law, based on omissions or untrue statements Galligan made about the proposed Starnet acquisition. In the fifth claim, Dick alleges that all defendants except ITT and USTS are liable for common law fraud, based on their misrepresentations about the Starnet acquisition. Defendants argue that plaintiffs have abandoned those claims because they do not make any arguments about them. We agree.

Plaintiffs specifically address Dick's claims only in the assignment of error and in a sentence summarizing the trial court's judgment. Plaintiffs make no arguments about when the statute of limitations began to run on Dick's claims or whether Dick was on inquiry notice about the alleged securities law violations and fraud. Moreover, plaintiffs did not make any arguments about the second and fifth claims in their reply brief or at oral argument. Those claims are therefore presumed to be abandoned. *Meskimen v. Larry Angell Salvage Company*, 286 Or 87, 94, 592 P2d 1014 (1979); *Hodecker v. Butler*, 64 Or App 167, 172, 667 P2d 540 (1983); *see also* ORAP 5.45(6).

## Third Claim for Relief

Plaintiffs'[24] next assignment[25] is that the trial court erred in granting summary judgment on their third claim for relief, which alleges that all defendants are liable for securities law violations. That claim is based on the ITT merger and is predicated on plaintiffs' assertion that either AmNet or

---

[24] Plaintiffs' remaining assignments do not involve claims by Dick. Hereinafter, when we refer to plaintiffs, we do not include him.

[25] Plaintiffs make multiple "assignments" about their third claim for relief. Those assignments are, in fact, arguments about separate allegations contained in that claim.

ITT purchased plaintiffs' stock by means of fraudulent statements and omissions of material fact in a May, 1988, proxy statement, in violation of ORS 59.127.[26] The trial court granted summary judgment on alternative grounds. Because it is dispositive, we first consider the court's conclusion that there was no genuine issue of material fact about whether there were fraudulent statements or omissions in the proxy statement.

ORS 59.127 imposes liability on persons who purchase securities by means of a material untrue statement or omission. A misrepresentation or an omitted fact is material "if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." *TCI Industries, Inc. v. Northway, Inc.*, 426 US 438, 449, 96 S Ct 2126, 48 L Ed 2d 757 (1976), *quoted with approval in Everts v. Holtmann,* 64 Or App 145, 151, 667 P2d 1028, *rev den* 296 Or 120 (1983). Materiality is an objective question that can be answered as a matter of law only when reasonable persons could not differ about the importance of the misrepresentations or omissions. 64 Or App at 153.

Here, plaintiffs' third claim alleges several specific misrepresentations and omissions. We discuss, first, plaintiffs' argument that the trial court erred in granting summary judgment on allegations contained in paragraphs 55(1) and 56(1) of their complaint. Paragraph 55(1) alleges that the proxy statement fraudulently represented that the ITT merger was in the best interests of AmNet and its shareholders. Conversely, paragraph 56(1) alleges that the proxy statement omitted the fact that the merger was not in the best interest of AmNet and its shareholders. Plaintiffs argue

---

[26] ORS 59.127 provides, in part:

"(1) A person who purchases a security is liable * * * to the person selling the security, if the person:

"* * * * *

"(b) Purchases a security by means of an untrue statement of material fact or an omission to state a material fact * * * and if the person does not sustain the burden of proof that the person did not know, and in the exercise of reasonable care could not have known, of the untruth or omission.

"* * * * *

"(3) Every person who directly or indirectly controls a purchaser liable under subsection (1) of this section * * * or * * * who participates or materially aids in the purchase is also liable * * * to the same extent as the purchaser * * *."

that there is "ample evidence" that AmNet's directors knew that the merger was not in the company's best interest. Defendants argue that the alleged misrepresentations are not actionable because the directors reasonably believed that the merger was fair.

The proxy statement explains, in relevant part, that "[t]he Company's Board of Directors has unanimously approved the [ITT merger], having determined that the acquisition of the Company by USTS pursuant to the Exchange Agreement is in the best interest of the Company and its shareholders." The statement does not affirmatively state that the merger is *in fact* in the best interest of AmNet and its shareholders. It reports an action taken by the directors after they formed an *opinion* about the merger. The issue is whether that opinion is actionable under ORS 59.127.

No Oregon cases address that issue. In actions involving Section 14(a)[27] of the Securities Exchange Act of 1934, as implemented by SEC Rule 14a-9,[28] however, opinions concerning the "fairness" of a corporate transaction are actionable if those opinions are material and are known to be false or misleadingly incomplete. *Virginia Bankshares, Inc. v. Sandberg*, 501 US 1083, ___, 111 S Ct 2749, 2759, 115 L Ed 2d 929 (1991). In *Virginia Bankshares*, a bank holding company arranged a "freeze-out" merger in which minority shareholders lost their interest in stock they owned. The directors solicited proxies for voting on the merger and said that they had approved the plan because of its opportunity for

---

[27] Section 14(a) provides:

"It shall be unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 781 of this title." 15 USC § 78n(a) (1934).

[28] SEC Rule 14a-9 provides, in part:

"No solicitation subject to this regulation shall be made by means of any proxy statement * * * containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading * * *." 17 CFR § 240.14a-9 (1990).

the minority shareholders to achieve a fair price for their stock. The plaintiff did not give the requested proxy and, after the merger, brought an action against the directors and holding company under section 14(a) and SEC Rule 14a-9, alleging that the proxy statement misrepresented that the directors believed that the merger was fair.

The United States Supreme Court first determined that statements of opinion in a proxy statement could be material, because

"[s]hareholders know that directors usually have knowledge and expertness far exceeding the normal investor's resources, and the directors' perceived superiority is magnified even further by the common knowledge that state law customarily obliges them to exercise their judgment in the shareholders' interest." 501 US at ____, 111 S Ct at 2757.

The Court then said that statements of opinion could be factual "as statements that the directors do act for the reasons given or hold the belief stated * * *." 501 US at ____, 111 S Ct at 2758. The Court emphasized that, in actions involving proxy fraud, whether the directors' statements of opinion were made with knowledge that the directors did not hold those opinions could be proved by "facts [that] either furnish good reasons [for the directors] to make a conclusory commercial judgment, or * * * count against it * * *." 501 US at ____, 111 S Ct at 2758. Those facts include corporate minutes, statements of the directors and "circumstantial evidence bearing on the facts that would reasonably underlie the reasons claimed [in the proxy statement] and the honesty of any statement that those reasons are the basis for a recommendation or other action." 501 US at ____, 111 S Ct at 2758.

■ ORS chapter 59 does not have a section parallel to section 14(a) and SEC Rule 14a-9. Here, however, plaintiffs' claim is based on allegations that a proxy statement contained a material untrue statement or omission. We have already determined that the proxy statement contains an opinion by the directors that the merger was in the best interest of AmNet and its shareholders. Under those circumstances, we conclude that the analysis in *Virginia Bankshares* is applicable, and that defendants' statement

of opinion could be treated as a statement of fact actionable under ORS 59.127.[29]

Plaintiffs contend that there is ample evidence that AmNet's directors knew that the merger was not in the company's best interest. Defendants' evidence consists of the proxy statement and affidavits of members of AmNet's board of directors (the board). Galligan's affidavit avers that AmNet contacted numerous potential investors and merger partners, but that only ITT made a viable offer. The affidavits of Galligan and defendants Geiger, Bosboom and Douglas assert that the board knew that AmNet was in extreme financial distress. Those defendants believed that AmNet would cease operations if the ITT merger did not occur and that, in that event, the shareholders would receive nothing for their stock. The affidavits aver that those defendants believed in good faith, based upon the exercise of reasonable business judgment, that the ITT transaction was fair and in the best interest of AmNet and its shareholders.

Plaintiffs do not directly controvert defendants' affidavits. Instead, the gist of their argument appears to be that there are issues of fact about circumstantial evidence that allegedly shows the directors did not or could not have believed that the merger was fair.

First, they contend that it is an issue of fact whether a Chapter 11 bankruptcy proceeding was a viable option. The proxy statement has a lengthy explanation of the reasons why the directors concluded that the merger was in the best interest of AmNet and its shareholders. It specifically addresses the reasons why the directors did not consider bankruptcy to be a viable option. Plaintiffs do not offer any evidence that the statement's description of the bankruptcy option was materially untrue. Similarly, they offer no evidence to rebut defendants' affidavits, which aver that the directors did not believe that bankruptcy was a viable option.

Second, plaintiffs argue that the inquiries of other potential investors were intentionally ignored. Plaintiffs cite

---

[29] Our conclusion is consistent with Oregon cases that discuss exceptions to the general rule that, in fraud cases, statements of opinion are not actionable, even though false. *See, e.g., Holland v. Lentz*, 239 Or 332, 397 P2d 787 (1964).

as evidence internal memoranda prepared by AmNet's financial advisor, Manufacturer's Hanover Bank (bank), and to correspondence from Fibernet, another long distance company, to CPN and PTI. The memoranda provide evidence that the bank received inquiries expressing interest in AmNet.[30] In each case, the memoranda show that the bank told each interested party that, if it made an offer, the bank would forward the offer to AmNet. There is no evidence that AmNet received any offers from those prospective suitors. There is also evidence that Fibernet offered to purchase AmNet stock held by CPN and PTI in exchange for a Fibernet five-year, non-interest bearing convertible note, valued at 50 cents per share. CPN and PTI declined Fibernet's offer. We conclude that plaintiffs' evidence does not show or raise an inference that inquiries from potential merger candidates were intentionally ignored. Neither does it rebut defendants' evidence that the directors believed that there was no viable offer other than the one from ITT.

Next, plaintiffs argue that the merger was unfair because three directors had "actual" conflicts of interests. The only evidence that plaintiffs cite in support of their argument is the proxy statement, which discloses that Galligan was formerly a vice-president of PTI and that, at the time of the merger, Geiger and Perry were directors of PTI and AmNet. Plaintiffs do not explain why, in the light of that disclosure, there is an issue of material fact about whether those conflicts provide circumstantial evidence that the directors did not believe that the merger was fair.

Finally, plaintiffs argue that it is an issue of fact whether PTI's and Ford's decision to forgo payment for their AmNet shares was a "device to create the illusion of fairness." That argument is predicated on plaintiffs' assertion that the ITT merger "effectively released Ford from any liability associated with the Starnet transaction."[31] The evidence that plaintiffs cite shows that, before the merger, Ford

---

[30] For example, there is evidence that Fibernet contacted the bank about acquiring AmNet. A memorandum discloses that the bank told Fibernet that it would like to work with that company if it made an offer, and would forward any offer to AmNet. The bank gave Fibernet its phone number, address and facsimile number to allow Fibernet to communicate its written offer. The bank also told Fibernet that time was of the essence. There is no evidence that Fibernet made a written offer to AmNet.

[31] Plaintiffs also argue that the merger effectively released PTI from liability on

paid more than $500,000 to settle a claim that AmNet had asserted against Ford. The proxy statement discloses the settlement. We conclude that plaintiffs' evidence does not raise an issue of material fact about whether the decision by Ford and PTI to forego payment for their AmNet shares was somehow improper.

■ Defendants' affidavits state facts that the directors had good reasons to conclude that the merger was in the best interest of AmNet and its shareholders, that the proxy state-ment truthfully reflected their judgment and that they in fact held the opinions stated in the proxy statement. Plaintiffs' argument that other statements or omissions in the proxy statement provide circumstantial evidence that the directors could not have actually believed that the merger was in the best interest of the corporation or its shareholders is not supported by the uncontroverted evidence in the summary judgment record. We conclude that there is no genuine issue of material fact about whether the proxy statement misrepresented that the directors believed that the merger was in the best interest of AmNet and its shareholders, or that they did not act for the reasons given in the proxy.

We next consider plaintiffs' argument that the trial court erred in granting summary judgment on allegations contained in paragraphs 55(2), 55(3) and 56(6) of their third claim for relief. Those paragraphs allege that the 1988 proxy statement fraudulently described the Starnet acquisition. Plaintiffs make no specific arguments about those paragraphs. Defendants contend that the proxy had no misrepresentations and even if it did, they were immaterial. We agree.

■ Paragraph 55(2) alleges that the proxy statement misrepresented Ford's purchase of AmNet shares as a normal business transaction, giving the impression that Ford had invested in AmNet. Paragraphs 55(3) and 56(6) allege that the proxy statement fraudulently describes Ford's purchase of AmNet stock and the Starnet acquisition as two transactions, when it was "actually two parts of one transaction," where Ford "unloaded its losses." The proxy statement

---

AmNet debt. We need not consider that argument, because the evidence that plaintiffs cite refers only to the Starnet transaction.

describes the historical facts of the Starnet acquisition.[32] It discloses that Ford's purchase of AmNet stock and the acquisition of Starnet's assets and liabilities were connected transactions. Plaintiffs do not offer any evidence contradicting the fact that Ford received AmNet shares in exchange for money. Further, any difference between the proxy statement's description of that transaction and plaintiffs' characterization of it is immaterial.

Plaintiffs argue that whether the ITT merger was structured to release Ford from liability for misrepresentations and other claims that AmNet had in relation to the Starnet transaction is "a hotly contested issue of fact." We need not address that argument, because plaintiffs do not explain how it relates to paragraphs 55(2), 55(3) and 56(6), which do not contain any allegations about the ITT merger or the settlement between AmNet and Ford.

Plaintiffs next argue that the court erred in granting summary judgment on the allegations in paragraphs 55(4), 55(5) and 56(3) of the third claim. Paragraph 55(4) alleges that the proxy statement fraudulently asserted that, after the ITT merger, PTI would remain at risk for AmNet's debt. Plaintiffs, again, make no specific arguments about those paragraphs or cite to any evidence in the record. Defendants argue that the evidence is that, at the time of the merger, PTI had guaranteed AmNet's obligation to four creditors and that the merger did not release PTI from its guaranty to those creditors. We agree. Evidence in the summary judgment record, which plaintiffs do not controvert, supports defendants' argument.

Similarly, paragraph 56(3) alleges that the proxy statement failed to disclose that PTI benefited from the merger more than other stock holders, because the overall result of the ITT merger "eliminated all potential liability of PTI and its guarantees or other assumption of AmNet liabilities." The merger did not release PTI from its guarantees of AmNet's liabilities. The proxy statement discloses the existing relationships between AmNet and PTI and describes

---

[32] Plaintiffs' statement of fact describes the Starnet acquisition as "financial homicide," because of the losses that it caused Amnet. The liabilities that AmNet assumed when it purchased Starnet were disclosed in its 1986 SEC form 10-K report.

the effect of the merger on those relationships. Plaintiffs do not argue that PTI had any other undisclosed liability as a result of the merger.

Paragraph 55(5) alleges that PTI, Ford and CPN received little or no consideration for their AmNet shares, creating an overall "impression of fairness," when, in fact, they would benefit from the merger. The proxy statement describes the consideration those companies were to receive for their shares in the ITT merger. Plaintiffs do not explain why that description created an untrue impression of fairness. Instead, they argue that the proxy statement "should have explained the [ITT merger] had the net effect of releasing both PTI from its liability on AmNet debt and Ford from liability to AmNet." As we have said, the evidence shows that the merger did not release PTI from its liability on AmNet's debt. Further, the proxy statement discloses AmNet's settlement with Ford.

Plaintiffs next contend that the court erred in granting summary judgment on the allegations in paragraph 56(2). That paragraph alleges that the proxy statement failed to state that the ITT merger would eliminate shareholder derivative claims. The proxy statement discloses that, after the merger, USTS might be the only party with the right to assert derivative claims.[33]

Next, plaintiffs assert that the court erred in granting summary judgment on the allegations in paragraphs 56(4) and 56(5) of their third claim. Those paragraphs allege that the proxy statement misrepresented that CPN and PTI had agreements with AmNet that gave them "preferential rates" for AmNet's services. The proxy statement discloses that volume customers received reduced rates and that PTI and CPN were AmNet customers. Plaintiffs argue that whether the rate those companies received is properly characterized as a volume discount or an insider rate is a question of fact. Defendants' affidavits say that neither CPN and PTI

---

[33] On appeal, plaintiffs argue that defendants failed to disclose that one purpose of the merger was to eliminate minority shareholder derivative claims. Defendants argue that we should not consider plaintiffs' argument, because they raise it for the first time on appeal. We agree. The parties to an appeal are restricted to the theory on which the case was tried in the lower court. *Leiser v. Sparkman*, 281 Or 119, 122, 573 P2d 1247 (1978).

received preferential rates. Plaintiffs have presented no evidence to the contrary. The trial court did not err.

■ Finally, plaintiffs argue that the trial court erred in granting summary judgment on the allegations in paragraphs 56(7) and 56(8) of their third claim. Paragraph 56(7) alleges that the proxy failed to disclose that "AmNet had a significant fraud claim against Ford related to Ford's under-reporting of its losses in the [Starnet] transaction." Paragraph 56(8) alleges that "Ford's agreement to forego receipt of consideration for its shares was conditioned on a release from all claims that AmNet had against Ford." Plaintiffs argue that the timing of the settlement between AmNet and Ford raises an issue of fact. Defendants contend that the proxy statement did not omit any material fact about the settlement. As we noted earlier, the proxy statement discloses the terms of the settlement. The evidence is that Ford's return of its shares to AmNet was not part of the settlement agreement.[34] Even assuming that Ford agreed to surrender its shares in consideration for a release of AmNet's claim against it, plaintiffs do not explain why a failure to disclose that fact is material. At the time of the merger, plaintiffs received more money for their shares because Ford agreed to surrender its AmNet stock for no consideration. We can discern no reason why a reasonable shareholder would view the purported omission to be important in deciding whether to vote for the merger.

■ We conclude that the trial court did not err in granting defendants summary judgment on plaintiffs' third claim for relief. The evidence in the summary judgment record shows that the omissions and misrepresentations alleged by plaintiffs either did not occur, were immaterial or were opinions that were actually held by the directors.[35]

---

[34] A memorandum from Ford proposed that it would surrender its shares and support the ITT merger as consideration for an agreement by AmNet and ITT to release Ford from AmNet's claim against it. That proposal is not part of the final agreement between AmNet and Ford.

[35] Even if we were to infer from the evidence that the there is an issue about the directors' credibility, under the circumstances in this case, that is insufficient to defeat a summary judgment motion. *See To v. State Farm Mutual Ins.*, 319 Or 93, 873 P2d 1072 (1994).

## Sixth Claim for Relief

 Plaintiffs' next assignment is that the court erred in granting summary judgment on their sixth claim for relief, which alleges a claim against all defendants for common law fraud in connection with the 1988 ITT merger. In a common law fraud claim involving the sale of stock, one element a plaintiff must show is that the seller made a material misrepresentation. *Metal Tech Corp. v. Metal Teckniques Co., supra,* 74 Or App at 307. Here, the fraudulent omissions and misrepresentations alleged by plaintiffs are the same as those alleged in their third claim for relief. We have already concluded that those alleged omissions and misrepresentations either did not occur, were immaterial or were opinions actually held by AmNet's directors. The trial court did not err in granting defendants' motion for summary judgment on plaintiffs' sixth claim for relief.

## Seventh Claim for Relief

 Plaintiffs' next assignment is that the court erred in granting summary judgment on their seventh claim for relief. That claim is asserted by Loewen against PTI. It is based on a letter sent to Loewen by Galligan in September, 1984, about the proposed merger between AmNet and SaveNet. In that letter, Galligan said that *AmNet* was prepared to provide

> "$3 million as needed during the next 90 days to ensure that service to SaveNet customers will not suffer as a result of the [merger] and to provide continued funding as needed above and beyond that consistent with the requirements of the business."

Even assuming that the letter could be construed as an offer by *PTI* to fund AmNet indefinitely, defendants cite to voluminous evidence, including testimony by Loewen, that any such offer was superseded by subsequent, final agreements between PTI, AmNet, Loewen and SaveNet that did not provide that PTI would indefinitely fund AmNet.

Plaintiffs do not contradict defendants' evidence. On appeal, they cite *Lusk v. Monaco Motor Homes, Inc.*, 97 Or App 182, 775 P2d 891 (1989), in support of their argument that whether PTI intended to fund AmNet is "inherently" a

question of fact that is not appropriate for summary judgment. We disagree. There is no language in *Lusk* that supports plaintiffs' sweeping statement. The issue here, as in *Lusk*, is whether there was evidence before the trial court at the time of summary judgment that created a genuine issue of material fact. Based on the evidence in the summary judgment record, we conclude that there is no evidence or inference that creates a genuine issue of material fact about whether PTI contractually promised Loewen that it would indefinitely provide funding to AmNet.

Because of our disposition of the assignments of error that we have discussed, we need not consider plaintiffs' remaining assignments.

 Defendants cross-appeal the trial court's denial of their motion under ORCP 46 C for awarding expenses against John Loewen.[36] We review for abuse of discretion. *Kitzerow v. Reinhardt*, 74 Or App 582, 584 n 1, 704 P2d 132 (1985). ORCP 46 C provides:

> "If a party fails to admit the genuineness of any document or the truth of any matter * * * and if the party requesting the admissions thereafter proves the genuineness of the document or the truth of the matter, the party requesting the admissions may apply to the court for an order requiring the other party to pay the party requesting the admissions the reasonable expenses incurred in making that proof, including reasonable attorney's fees. The court shall make the order unless it finds that (1) the request was held objectionable pursuant to Rule 45 B or C, or (2) the admission sought was of no substantial importance, or (3) the party failing to admit had reasonable ground to believe that such party might prevail on the matter, or (4) there was other good reason for the failure to admit."

Defendants submitted requests for admission to Loewen. He denied that he was aware on or before May 8, 1988, that the *Guenther* and *Numrich* lawsuits had challenged the propriety of the AmNet/SaveNet merger, the AmNet/CPN transaction and the Starnet acquisition. Defendants incurred expenses in

---

[36] Defendants' cross-appeal originally named John Loewen, Leland Loewen, Altorfer and Dick as adverse parties. On appeal, defendants appeal the trial court's denial of their ORCP 46 C motion only as it concerns John Loewen.

producing evidence that they contend contradicts Loewen's denial.

Defendants argue that the trial court did not have the discretion to deny their motion, because it "found" that Loewen knew about the nature of those lawsuits before February 23, 1988. The trial court did not make that finding.

The trial court's letter opinion reads, in part:

"My August, 1992 [summary judgment] opinion was aimed at deciding when Plaintiffs were on notice for statute of limitations purposes. I did not make any precise findings as to when each of the Plaintiffs knew about the other lawsuits. Therefore, I cannot say with certainty that Plaintiffs' answers to the requests for admissions were inaccurate or misleading. If Defendants had been dissatisfied with the Plaintiffs' response to the requests, the responses could have been challenged under Rule 45C. That was never done."

Because defendants did not prove that Loewen's denial was not genuine, the trial court did not abuse its discretion in denying defendants' ORCP 46 C motion.

Affirmed on appeal and on cross-appeal.