AMES,
*Appellant,*
*v.*
FALLERT et al,
*Respondents.*

(No. C-79-12-148, CA A21610)

657 P2d 224

Sam F. Speerstra, Salem, argued the cause for appellant. With him on the briefs were James W. Gardner, Gold Beach, and Rhoten, Rhoten .& Speerstra, Salem.

Gerald R. Pullen, Portland, argued the cause and filed the brief for respondents.

Before Buttler, Presiding Judge, and Warren and Rossman, Judges.

ROSSMAN, J.

**ROSSMAN, J.**

This is "The Case of the Unsigned Deed." Plaintiff's action, sounding in equity, prays for a judgment declaring him to be the owner of a one-half interest in certain real property, because his signature did not appear on a 1965 deed. Defendants answered, raising the affirmative defense of laches, counterclaiming for reformation of the deed or title by adverse possession, and seeking dismissal of plaintiff's action and a decree quieting title to the property in defendants. Plaintiff appeals from a judgment for defendants on their defense and counterclaims. Plaintiff assigns error to the trial court's (1) ruling that plaintiff's action was barred by laches; (2) reforming the 1965 deed; (3) determining title to the property had passed by adverse possession; and (4) giving weight to the fact that the "non-signature" on the deed had been duly notarized. We sustain the trial court's judgment on the ground that the 1965 deed should be reformed.

Plaintiff Ames and defendant Fallert were business partners, who had formed a limited partnership in Brookings, Oregon, during the 1950's. They also incorporated and became the sole stockholders of several businesses. During this period, Ames and Fallert purchased commercial property as tenants in common, including the so-called "Mosher" and "Craig" parcels. A third parcel, the "Kerr" property, was owned equally by Fallert and Ames and the limited partnership. On February 1, 1965, four of the businesses were reorganized into the South Coast Lumber Company (South Coast), a corporation. In July, 1965, a deed was prepared to transfer Mosher, Craig and the individual interests in Kerr[1] to South Coast as part of the reorganization. On July 8, 1965, the deed was signed by Fallert, his wife and Ames' wife; the wives signed to eliminate their dower interests.[2] Ames' signature does not appear on the deed. The manager of the bank branch handling the transaction notarized the signatures and certified that each of the four grantors, including Ames, had appeared,

---

[1] Either at the time of the corporate reorganization or at some subsequent time, the partnership's one-third interest in the Kerr property was conveyed to South Coast.

[2] *See* former ORS 113.410 (*repealed by* Or Laws 1969, ch 591, § 305).

executed the deed and acknowledged to him that they had done so voluntarily. Mrs. Ames testified that she would not have signed the deed without her husband's knowledge and consent and that she was sure her husband was present at the meeting. The deed was recorded.

Until 1977, the parties acted consistently with the conveyance of the lands in question by Ames and Fallert to South Coast. For example, the corporation paid all taxes on the property until 1977. Also, in 1973, Ames sold all his stock in South Coast back to the corporation for a substantial amount. Fallert testified that the purchase price included the value of all the lands. In April, 1977, a quitclaim deed to the property described in the 1965 deed was sent to both Ames and Fallert in order to clear the title. Ames checked the 1965 deed and discovered that his signature was missing. Fallert signed his quitclaim deed; Ames did not. As a result, apparently, of only Fallert's signing, the tax assessor began in June, 1977, to show Ames on the tax rolls for the property in question. Ames then, for the first time, asserted that he had retained a one-half interest in the properties.

This action was filed in December, 1979. At trial, Ames testified that he did not remember being asked to sign the deed, although he was "sure" it was presented to him. He testified that he did not intend to convey the properties to South Coast in 1965. An accountant for South Coast testified that before and after the reorganization Ames and Fallert had spoken generally of retaining individual property outside South Coast, but that he had no knowledge of specific parcels or of the particular transaction in 1965. The trial judge stated in his letter opinion that "the overwhelming evidence indicates plaintiff intended to sign" the 1965 deed, which indicates that Ames' testimony was accorded little, if any, weight.

On appeal, plaintiff argues that the deed is void *per se* under a general rule that agreements made in contravention of statute will be avoided when the statute is intended for the protection of the public. ORS 93.010, 93.020(1), 93.410 and 41.580[3] appear to require that a deed be signed.

---

[3] The versions of the statutes in effect at the time the deed was executed in July, 1965, do not differ substantially from the current ones.

He contends that the purpose of those statutes is to prevent the fraudulent transfer of real property. In support of this approach, he cites *Huff v. Bretz,* 285 Or 507, 515-16, 592 P2d 204 (1979), and cases cited therein.

The most direct answer to plaintiff's line of argument on voidness is that none of the cases deals with the question of reformation of a document containing a statutory defect. There is no question but that the statutes cited by plaintiff would render an unsigned deed unenforceable as to the nonsigner. Plaintiff's contention that this deed was void *ab initio* would perforce lead to the conclusion that reformation is unavailable as a matter of law to supply a missing signature on a deed. Plaintiff suggests no authority for that proposition, and we find none. To the contrary, the general rule is that "where parties to a deed or mortgage fail to sign it, * * * reformation may be decreed as against a person with notice of the defect." 66 Am Jur 2d 580, *Reformation of Instruments* § 56.

In *L.B. Menefee Lumber Co. v. Gamble,* 119 Or 224, 234, 242 P 628 (1926), the court quoted with approval a portion of a United States Supreme Court opinion describing the standards for reformation of a written instrument:

> " 'Where the agreement as reduced to writing omits or contains terms or stipulations contrary to the common intention of the parties, the instrument will be corrected so as to make it conform to their real intent. The parties will be placed as they would have stood, if the mistake had not occurred. * * * The party alleging the mistake must show exactly in what it consists, and the correction that should be made. The evidence must be such as to leave no reasonable doubt upon the mind of the court as to either of these points. * * * The mistake must be mutual and common to both parties to the instrument. It must appear that both have done what neither intended. * * * Where the minds of the parties have not met, there is no contract and hence none to be rectified.' *Hearne v. Marine Ins. Co.,* 20 Wall. 488 (22 L. Ed. 395)." (Citations omitted; emphasis supplied.)

The Oregon authority most analogous to this case is *Smith v. Cram,* 113 Or 313, 230 P 812 (1925). In that case, a father and son mortgaged real property. Both signed the mortgage, but the son failed to sign the document in his

capacity as trustee. The son not only owned a portion of the real property individually, but he also held half of it in trust for other family members. Although the son, as trustee, resisted reformation of the mortgage, the court allowed it, because it concluded beyond a doubt that the intention of the parties was to mortgage the entire estate, including the trust estate. The court said:

> "* * * The testimony of the scrivener as to the intention of the parties is not disputed. It is corroborated by the mortgage itself, which purports to convey the entire estate in the land, by the conduct of the parties in using the money loaned by the mortgagor to pay off the overdue liens then against the property, and by the silence of the mortgagors in regard thereto. This money was all paid out by the bank for the parties in cancellation of said mortgage indebtedness. There is no doubt at all that the mortgagee C. Sam Smith believed when he made the loan of $31,000 to the defendants Henry Cram [father] and James Cram, Jr. [son], that he was being secured for that loan by the entire estate in the land. We entertain no doubt that the defendant Henry Cram and James Cram, Jr., intended to convey all of the estate including the trust estate, for the purpose of securing that loan. The arrangement of giving the mortgage to the said C. Sam Smith for the purpose of paying the overdue mortgage indebtedness was for the benefit of the trust estate. It was so accepted and received by defendants. The reformation prayed for to the extent of adding the name of James Cram, Jr., as trustee, to the mortgage was one which a court of equity has power to make: 34 Cyc. 934, § 4; 23 R. C. L. 332, 333, §§ 23, 24. * * *"

Under the circumstances in this case, we have no doubt that Ames intended to convey his interest in the real property in question in 1965, despite his self-serving testimony to the contrary. We find that both Mr. and Mrs. Ames were presented with the deed at the meeting attended by Mr. and Mrs. Fallert. Mrs. Ames signed the deed for the sole purpose of clearing the title of her dower interest, an interest she had only by virtue of her husband's ownership of the property. She signed in conjunction with a conveyance by the husband of his interest in property. *See* n 2, *supra.* Mrs. Ames' signature is thus consistent *only* with an intent on the part of Mr. Ames to sign the deed. Furthermore, the bank officer who notarized the deed obviously

thought that Ames had signed it, and we infer that Ames did not at that meeting reveal any intention *not* to sign.[4] Finally, Ames made no mention of any claim to this property in 1973, when he sold his entire interest in South Coast for a substantial sum, although that sum was intended to to reflect the value of all lands owned by South Coast, including the property in question. Both Ames and Fallert acted for 12 years as if their individual interest in the property property had in fact been fully conveyed in 1965, during which time South Coast paid the taxes on it.

We conclude, as did the trial court, that it is clear that both Ames and Fallert intended to convey their individual interests in the property in question to South Coast in 1965, and that both Ames and South Coast believed that the deed had been signed by all the grantors; there was a mutual mistake. *See Smith v. Cram, supra.* The trial court did not err in reforming the deed to add the signature of Ames.

Affirmed.

---

[4] Plaintiff argues that no weight should be given to the notarization, because the notary violated his duty in falsely acknowledging that a person had signed a document when that signature does not appear to have been made at the time the deed was executed. ORS 194.310 prohibits a notary public from wilfully making a false acknowledgment. There is, however, no evidence here that the notary wilfully made a false acknowledgment. The record suggests at most negligent acknowledgment. We thus reject plaintiff's contention.