633 So.2d 468 (1994)
Robert B. COOK, Appellant,
v.
THEME PARK VENTURES, INC., et al., Appellees.
No. 92-3136.
District Court of Appeal of Florida, Fifth District.
February 4, 1994.
Rehearing Denied March 18, 1994.
*469 Richard Stringer, Kissimmee, and A. Paul Schwenke, Salt Lake City, UT, for appellant.
Ralph C. Losey and Brian J. Moran of Subin, Shams, Rosenbluth, Moran, Losey & Brennan, P.A., Orlando, for appellee Theme Park Ventures, Inc.
W. SHARP, Judge.
Robert Cook appeals from a final summary judgment in favor of Theme Park Ventures, Inc., which determined that Cook did not have a perfected security interest in a painting owned by Theme Park, because no written security agreement was executed. Cook argues there is a genuine issue of material fact as to whether certain documents constitute a written security agreement, thus precluding the entry of summary judgment. We agree and reverse.
This lawsuit involves a painting by Jackson Bailey, known as the "Life of Christ" which depicts scenes from the life of Christ on fifty panels. The painting is valued at between $500,000 to $1,500,000. It was owned by the Religious Art Institute of America, Inc., the predecessor corporation of Theme Park. William Sledge, a shareholder of Theme Park, loaned the corporation large sums of money over the years, secured by mortgages on property owned by Theme Park. The painting was also pledged as security, Sledge claimed, for a loan made in 1987.
For several years, the painting was stored at the Graves Company of Kissimmee and Graves demanded over $2,000,000 in storage fees. In March 1992, Theme Park filed an action for declaratory judgment against the Graves Company. On June 11, 1992, the court entered a temporary injunction enjoining the Graves Company from selling the painting for storage fees and requiring it to return the painting to Theme Park.
On June 14, 1992, Cook, as trustee, obtained an assignment of notes, mortgages, and security agreements from Sledge. Cook intervened in the proceedings, claiming that he had a security interest in the painting, that Theme Park had defaulted under its loan, and that Cook was entitled to possession of the painting. The trial court issued a temporary injunction enjoining Theme Park from removing the painting from Graves' warehouse. The injunction was dissolved when Cook failed to post the required bond and Theme Park took possession of the painting.
Theme Park moved for summary judgment on the basis that no written security agreement covering the painting had ever been executed. Although a security agreement had been discussed and considered, Theme Park alleged the parties never signed the proposed agreement and Sledge only had an unsigned copy of the proposed agreement and UCC financing statement. Theme Park further alleged that it had fully secured its debt owed Sledge by granting him mortgages on real property owned by it.
In support of its motion, Theme Park submitted an affidavit from John Chambers, Sr., who is an attorney as well as Chairman of the Board of Directors and Secretary of Theme Park. Chambers stated that William Sledge was a shareholder who had made loans to Theme Park over the years, that the debts now totaled $1,188,000, that the debts were secured by mortgages on property owned by Theme Park, and that an appraisal valued the property at $5,400,000. Chambers admitted that he had discussed the possibility of using the painting as security and had prepared a draft of a security agreement and financing statement and had sent them to Sledge. Chambers, however, claimed that Sledge was unfamiliar with art investments and paintings, and that he declined to take a security interest in the painting. Instead Sledge relied solely on the mortgages on the *470 real property as security for his loans. Thus no security agreement or UCC financing statement covering the painting were ever entered into or signed.
In opposition to Theme Park's motion for summary judgment, Cook submitted an affidavit from William Sledge. Sledge stated that he had retained Chambers to represent him in numerous business transactions over the years. In July 1987, Chambers asked him to loan Theme Park $450,000.00 and Chambers told him that the loan could be secured by real estate located in Florida and a security interest in the painting. Sledge attached a letter from Chambers dated July 6, 1987, in which Chambers states that the painting could also be pledged as security for existing and additional loans.
Chambers confirmed this understanding in another letter dated July 29, 1987. This letter contained various documents for Sledge's review, including a security agreement covering the painting and a UCC financing statement. The letter stated that these items were for Sledge's review only, but requested that Sledge sign the mortgage deed modification and modification of the note and return those documents. The letter then states: "After all of the documents are recorded and returned to us, we will prepare a set of all of the original documents in a package for you."
Based on this understanding, Sledge agreed to make the loan. On July 31, 1987, he wired $450,000.00 to Chambers' escrow account. Sledge alleged he understood from Chambers' letter that he was to receive both a mortgage on real property and a security interest in the painting.
Section 679.203, Florida Statutes (1991) provides that a security interest is not enforceable against the debtor and does not attach to the property unless the collateral is in the possession of the secured party pursuant to an agreement or the debtor has signed a security agreement, which contains a description of the collateral. A "security agreement" means an agreement which creates or provides for a security interest. § 679.105(1), Fla. Stat. (1991).
A security agreement need not be evidenced by a single document. Two or more writings considered together, may constitute a security agreement. Matter of Miller, 545 F.2d 916, 918 n. 4 (5th Cir.), cert. denied, 430 U.S. 987, 97 S.Ct. 1687, 52 L.Ed.2d 382 (1977); In the Matter of The Kids Stop of America, Inc., 64 B.R. 397 (Bankr.M.D.Fla. 1986). The security agreement is the contract between the parties and must show an actual meeting of the minds of the contracting parties. American Restaurant Supply Co. v. Wilson, 371 So.2d 489 (Fla. 1st DCA 1979); S.E.L. Maduro (Fla.) v. Strachan Shipping Co., 800 F.2d 1572 (11th Cir.1986).
The first letter dated July 6, 1987, merely states that the painting is available as collateral and requests that Sledge state his terms if he decides to make the loan. This letter shows only an offer to pledge the painting as collateral and is insufficient to constitute a security agreement. See S.E.L. Maduro (Fla.) Inc. (intentions are not sufficient to create a security agreement; there must be an actual meeting of the minds between the contracting parties).
However, the letter dated July 29, 1987, enclosed the loan documents, including the security agreement and UCC financing statement for Sledge's review "in connection with the new loan to be made to R.A.I." "R.A.I." refers to the Religious Art Institute of America, Inc., the predecessor of Theme Park; Chambers was the president of that corporation. The letter specifically lists the security agreement "covering the Life of Christ painting" and the UCC financing statement. The security agreement from the Religious Art Institute grants a security interest in the painting to Sledge, describes the painting and lists the notes secured by the agreement. The UCC financing statement describes the painting, lists the debtor as the Religious Art Institute and lists the creditor as Sledge.
The security agreement and UCC financing statement were sent for Sledge's review along with other documents which required his signature. The letter states that if the documents appear to be in order, then the funds could be sent by check or wire to Chambers' escrow account. Sledge wired the funds to Chambers a few days later, a fact uncontested by Chambers. This shows acceptance of the documents by Sledge. The letter also states that a set of original documents *471 will be sent to Sledge after they are recorded.
Although the security agreement and UCC financing statement were not signed, the letter was signed by Chambers. The comment to section 679.203 notes that the formal requirement of a writing under that section is in the nature of a statute of frauds. 19C F.S.A. 212-213 (1990). For purposes of the statute of frauds, several writings, only one of which is signed by the debtor, may be aggregated to satisfy the statute provided that the signed writing expressly or implicitly refers to the unsigned document. First Guaranty Corporation v. Palmer Bank & Trust, 405 So.2d 186 (Fla. 2d DCA 1981). In addition, parol evidence is in certain instances admissible to clarify the writing. Id.
Here the letter referred to and enclosed the security agreement and UCC financing statement. The letter also sets out the indebtedness and the collateral securing that indebtedness. The letter was signed by Chambers, who was the president of the Religious Art Institute. Sledge indicated his acceptance of these terms by wiring the funds to Chambers. We think the signed letter and the enclosed security agreement and financing statement are sufficient to create an issue of fact regarding the existence of a security agreement covering the painting. See Rohlfing v. Tomorrow Realty & Auction Co., 528 So.2d 463 (Fla. 5th DCA 1988) (written "Real Estate Terms of Sale", "Buyers Guide", "Memorandum of Sale at Public Auction", and buyer's deposit check with notations on it were sufficiently definite and certain to establish a contract to buy land that complied with the statute of frauds). Since there is a question of fact as to whether a security agreement covering the painting was executed, the trial court should not have entered summary judgment in favor of Theme Park.
REVERSED and REMANDED.
PETERSON and DIAMANTIS, JJ., concur.