675 So.2d 144 (1996)
Benjamin S. SMITH, Appellant,
v.
ROYAL AUTOMOTIVE GROUP, INC., etc., et al., Appellees.
No. 94-2771.
District Court of Appeal of Florida, Fifth District.
May 3, 1996.
Rehearing Denied June 19, 1996.
*146 Thomas F. Neal and D. John Morgeson, Jr., of Drage, deBeaubien, Knight, Simmons, Romano & Neal, Orlando, for Appellant.
Stephen J. Calvacca, of Steven J. Calvacca, P.A., Orlando, for Appellee.
GRIFFIN, Judge.
Appellant, Benjamin Smith ["Smith"], appeals a series of adverse summary judgment and dismissal orders in favor of appellee, Royal Automotive Group, Inc., d/b/a Royal Mitsubishi, Inc., on his claims for reformation, breach of contract, misrepresentation and declaratory relief, fraud and rescission. We reverse.
At an unspecified time prior to this litigation, Smith received a letter of intent from Mitsubishi Motor Sales of America declaring that he was to be awarded a new Mitsubishi automobile franchise. Smith, about that time, was approached by Paul Norman, President of Royal Oldsmobile, Inc. ["Royal Olds"], who was scouting for dealerships that Royal Olds might add to its property. Smith informed him of the new franchise award and the two began to negotiate.
It appears clear that this transaction could not be consummated as an ordinary sale. Mitsubishi's letter of intent was personal to Smith and further approvals were necessary for Smith to acquire the dealership. Smith offered to take $125,000 immediately and $10,000 a month for ten years in exchange for the dealership. The deal was structured such that Smith and Royal Olds would together create a new company, Royal Imports,[1] which would operate the new franchise. Smith was to begin as a seventy-five percent owner and president of the new company while Royal Olds would be a twenty-five percent owner. Later, Royal Olds would have the option to buy out Smith for a nominal fee. In accordance with an Exclusive Agency Agreement ["Agency Agreement"], Smith was to be paid $125,000 by Royal Olds to acquire the franchise on behalf of Royal Imports, and under a Consultation Agreement and a Covenant Not to Compete ["Covenant"], Smith was to be paid by Royal Imports a total of $10,000 per month for ten years in return for his "services." Smith made it clear to Royal Olds that the payments that Smith was to receive would have to be guarantied by Royal Olds' parent company, Key-Royal Automotive Company ["Royal Group"].[2] Smith specifically told Norman that he was concerned about not getting all of his money if the dealership were sold.
In 1987, Royal Group owned approximately twenty-five percent of Royal Olds; fifteen percent of Royal Olds was owned by Norman (through a loan guarantied by Royal Group) and the remaining sixty percent was owned by other dealers who were affiliated with Royal Group. Royal Group had a consulting agreement with Royal Olds which was paid based on a fixed fee and a percentage of Royal Olds' profits, and Royal Group was a partner in the partnership that owned the land Royal Olds occupied.
Although Norman had authority from Royal Group to negotiate with Smith, he could not enter into a deal without direction from Royal Group's president, John Richardson. After Smith presented Norman with his offer to sell, Norman contacted Richardson at the company's headquarters in Birmingham. Richardson started the company's Birmingham attorneys working on analyzing the deal. Smith negotiated with Norman and never spoke directly with any other representative of Royal Group.
The basic terms of a deal were worked out and Royal Group's Birmingham attorneys began drafting the necessary contracts. The Birmingham firm represented both Royal Group and Royal Olds in the transaction but did not represent Smith.[3] Susan Leeds was the associate attorney assigned to the transaction. Leeds answered directly to a senior partner who had handled the firm's Royal *147 Group account for many years. Leeds got all of her information concerning the drafts including approvals for all material provisions from the senior partner. Leeds never spoke directly with Richardson.
The first drafts of the three agreements were sent directly to Smith by Leeds on December 18, 1987. The first drafts of the Covenant and Consultation Agreement did not contain provisions referring to any guaranty by Royal. The Agency Agreement did specify Royal Group's obligation to guaranty payments under the Agreement, although there was no signature block for Royal Group.
On December 22, 1987, Smith retained Orlando attorney, Charlie Egerton, to review these drafts. Smith limited Egerton's involvement to ensuring that the documents conformed to the terms Smith and Norman had agreed upon. Egerton recommended that the guaranties be explicitly mentioned in all three agreements and that Royal Group be a party to the execution of each. Egerton suggested these revisions directly to Leeds.
A second draft of the Agency Agreement was sent by Leeds to Egerton on approximately January 18, 1988. The following day Leeds faxed revised copies of the Covenant and the Consultation Agreement. The revised Consultation Agreement between Royal Imports and Royal Olds [collectively referred to as "the Corporation"] and Smith [the "Consultant"] contained a new "Item 6" which referenced a guaranty by Royal Group as follows:
6. Guaranty. The obligation of the Corporation to pay the Consultant the monthly compensation provided for hereunder shall be guaranteed by Key-Royal Automotive Company, a Delaware corporation which has an interest and financial stake in furthering the successful operation of the Dealership by the Corporation.
The Consultation Agreement also concluded with the following acknowledgment and signature block for Royal Group:
For the purpose of affirming and evidencing its agreement to be bound by the guaranty obligations set forth in Paragraph 6 of this Consultation Agreement, the undersigned corporation has caused its duly authorized officers to execute and attest this Agreement as of the date first above written.
KEY-ROYAL AUTOMOTIVE COMPANY, a Delaware corporation
ATTEST: By: ____________________________
 John B. Richardson
 Its President
By:______________________
Its___________
The revised Covenant included similar text.
Leeds testified that she would never have revised the drafts to include guaranty provisions without approval. Egerton testified that in negotiating with Leeds, he communicated Smith's insistence on the guaranty provisions and that Leeds later told him that her clients had agreed to the guaranties. Egerton stated that he informed Smith of Royal Group's agreement.
On February 2, 1988, Leeds sent a letter to Norman, enclosing the original and redlined copies of all three agreements, and relating that she expected negotiations concerning Smith's ability to terminate the Agency Agreement to continue. The letter also contains the following paragraph:
In the unlikely event Mr. Smith and his attorney are willing to forego any further negotiations, I have enclosed originals of each of the agreements for immediate execution. I would suggest that duplicates of each of the documents are made prior to *148 their signing so that each party will have an executed original.
The letter is unsigned, although Leeds stated in her deposition that she drafted it.
A second letter dated February 2, 1988 was sent by Leeds to Egerton. The salutation and body of the letter, a major topic of both parties' briefs, read as follows:
Dear Charlie:
I have enclosed for your review redlined copies of the Exclusive Agency Agreement, the Consultation Agreement and the Covenant Not to Compete to be executed in connection with the above-referenced transaction. As I mentioned to you during our telephone conversation, two issues over which you had expressed concern have not been modified in this most recent draft of the Exclusive Agency Agreement. Specifically, you had requested that Key-Royal Automotive Company agree to guarantee all obligations of Royal Oldsmobile and the Franchisee under the aforesaid Agreement. Mr. Richardson, President of Key-Royal, stated that his company would guarantee the payment obligations, but not the performance obligations, thereunder. In addition, I recall that you had suggested modifications regarding Mr. Smith's rights under Article Seven to terminate the Agreement. Unfortunately, my notes are not clear as to the specifics of your concern; therefore, we may need to discuss this issue once you have had an opportunity to review the documents.
Please let me know if you should have any questions or suggestions.
(Emphasis in original).
Leeds sent a third set of drafts to Norman along with a cover letter dated February 3, 1988. That letter is stamped "RECEIVED FEB 5 1988" and read as follows:
Dear Paul:
Enclosed are the revised pages to be inserted in the Exclusive Agency Agreement. I have also included an original and one red-lined copy of the Consultation Agreement which contains one minor change which Mr. Smith's attorney requested. As you noted, neither the Consultation Agreement nor the Covenant Not to Compete will be executed contemporaneously with the Exclusive Agency Agreement; however, I thought you should have a copy of the most recent version.
Please let me know if I may be of further assistance.
The to-be-inserted pages following Leeds' letter are present in the Agency Agreement actually executed by Norman and Smith. Norman testified that the documents they executed had arrived by overnight mail from Birmingham.
All three contracts were executed by Smith and Norman, without attorneys present, "as of" February 4, 1988, the former signing once in his individual capacity and again as president of the new Royal Imports, and the latter signing as president of Royal Olds. Before executing the documents, Norman and Smith deleted minor conditions in the Consultation Agreement and each initialed the changes. Smith and Norman each testified that, following the signing, the documents were to be forwarded to Royal Group's attorneys for Richardson's signature. Smith believes that they were forwarded but he never paid any attention to whether the documents were returned.
Norman testified that he never received copies or originals back from Birmingham, but a year before the litigation he received a phone call from Bill Cody, a staff person at Royal Group, asking Norman if he knew of papers which showed that Royal Group had guarantied the payments to Smith. Norman responded positively, stating that as he recalled there were guaranties. According to Norman, Cody stated something to the effect that he could not find a document with a guaranty on it.
On April 7, 1990, Norman sent Smith a letter officially acknowledging Royal Olds' decision to exercise its purchase option and requesting Smith to sign over his shares. Smith apparently did so.
Smith received the initial $125,000 and monthly payments of $10,000 for approximately four years. In August 1992, Royal Olds and Royal Imports sold their assets. Smith was then notified by Royal Imports *149 and Royal Olds that the monthly payments required by the Consultation Agreement and the Covenant would no longer be forthcoming. When Smith looked to Royal Group to honor their guaranties, Royal Group denied any liability, asserting that they had never signed any guaranties and had never agreed to do so. Smith then began the action below.
The record includes the deposition of Patricia Mize, Royal Group's controller during 1987 and 1988. She was responsible for its books and records, including all paperwork generated by and received by the company. Mize kept a file concerning the Smith-Royal Olds deal and if paperwork came into Royal Group that dealt with that transaction, she should have received it. The file contained only an unexecuted draft of the agreements received from the Birmingham firm. Mize testified that she did not receive a copy of Smith-Royal Olds agreements until Norman later had a copy sent to them in connection with an offer by someone to buy out Royal Olds and Royal Imports. Mize stated that after searching the company records she could find nothing that reflected an obligation by Royal Group to Smith. The acquisition of dealerships was usually dealt with and approved by Royal Group's board of directors.
Richardson was president of Royal Group in 1987 and became chairman of the board in 1988. Richardson testified that Royal Group thought that adding a foreign franchise to Royal Olds might help the business' bottom line and that Norman was asked to look for an available franchise. Although there may have been some discussion by the board about ongoing negotiations between Norman and Smith, the board never authorized any deal involving Norman and Smith. According to Richardson, the executed agreements never reached Royal Group. If they had, the boardand not hewould have decided the matter of the guaranties.
Richardson testified that Norman had related Smith's desire for the guaranties, but he never told Norman that any guaranty would be given by Royal Group. He also never said the guaranty would not be given. Richardson did not recall ever giving Norman authorization on behalf of Royal Group to execute the documents. Nevertheless, Norman testified that he would not have done so without Richardson's permission and that it was his understanding that once the signed documents were forwarded to Royal Group, they would be signed by Richardson. Richardson's signature as a member of the Royal Imports board of directors does appear on two resolutions by Royal Imports board of directorsone signed "as of" January 28, 1988 and the other "as of" February 19, 1988. Each document was also signed by Smith and Norman, who apparently made up the remainder of the board. When Richardson's attention was called to the letter of February 2, 1988, from Leeds, Richardson denied that he had ever met Leeds, had ever spoken to her, had ever seen the letter prior to this litigation, and that he ever told anyone that Royal Group would guaranty the obligations.
Royal Group filed a motion for summary judgment on the Second Amended Complaint, arguing that the unsigned contracts were within the statute of frauds' guaranty and one-year provisions and that there was a lack of evidence supporting the misrepresentation claim. Smith filed a memorandum in opposition to Royal Group's motion. Smith argued that the February 2 letter from Leeds to Egerton satisfied the statute. Smith also contended that the leading object rule removed the contracts from the guaranty provision of the statute and that the contingency of death or the part and full performance doctrines satisfied the statute's one-year provision. Smith finally asserted that Royal Group should be equitably estopped from relying on a statute of frauds defense and that the misrepresentation claim should be resolved by a trier of fact. Smith also filed a sworn affidavit stating that he was repeatedly advised orally and in writing by representatives of Royal Group that they would guaranty their subsidiary's payments. Smith added that he executed the documents in reliance on Royal Group's representations and that he was advised Royal Group would execute them after he and Norman had done so.
The court issued its order granting Royal Group partial summary judgment on the *150 breach of contract claim. The court ruled that while the application of the leading object rule satisfied the guaranty provision of the statute of frauds, the guarantied payments were to run for more than one year and thus the agreements were nevertheless within the statute. Smith filed a motion for rehearing. The court denied Smith's motion for rehearing and ruled against Smith on the unresolved portions of Royal Group's motion for summary judgment, deciding that the negligent misrepresentation action was barred as an attempt to circumvent the statute of frauds and the declaratory judgment issue was resolved by the other rulings.
Smith was then allowed to substitute counsel and to file a Third Amended Complaint. The Third Amended Complaint included a count for reformation of the Covenant and Consulting Agreement, rescission of the same and fraud.
Royal Group filed a motion to dismiss the Third Amended Complaint, arguing that the reformation claim must be dismissed because the court had already ruled that the statute of frauds rendered the contracts unenforceable and that reformation could not create a contract where no contract existed. Royal further argued that, under the facts, the law would forbid rescission and that the fraud claim was another inappropriate attempt to evade the statute of frauds.
Without elaboration, the court granted Royal Groups's motion to dismiss with respect to Counts II (rescission) and III (fraud) and denied the motion with respect to the reformation claim. Royal Group then filed an answer to the reformation claim, affirmatively pleading that there was no mutuality of assent so as to form a contract on which reformation might be based and that reformation cannot be had for a contract void under the statute of frauds.[4] Royal Group later filed a motion for summary judgment on Smith's remaining count for reformation. The court granted Royal Group's motion. Final judgment was thereupon entered against Smith in favor of Royal Group.
The documents specifically at issue on this appeal are the Covenant and the Consultation Agreement. There is no dispute among the parties that the Agency Agreement was fully performed.

I. Reformation
Smith contends that he and Royal Group agreed that the latter would guaranty monthly payments to Smith under the Covenant and Consultation Agreement, and that through mutual mistake or, alternatively, unilateral mistake coupled with inequitable conduct, Royal Group's signature fails to appear on the written contracts which memorialize their agreement. Smith requested that the trial court reform the contracts to reflect the omitted signatures.
Reformation is an equitable remedy. The Supreme Court of Florida summarized the doctrine the 1905 case of Jacobs v. Parodi, 50 Fla. 541, 39 So. 833 (Fla.1905), stating:
Where an agreement has been actually entered into, but the contract, deed, or other instrument in its written form does not express what was really intended by the parties thereto, equity has jurisdiction to reform the written instrument so as to conform to the intention, agreement, and understanding of all the parties.
Id. (citation omitted). Reformation, at its essence, acts to correct an error not in the parties' agreement but in the writing which constitutes the embodiment of that agreement. Thus the Florida courts have consistently held that where a mistaken writing is the product of the parties' mutual mistake, or unilateral mistake on the part of one party and inequitable conduct by the other, the writing should be reformed to accurately reflect the parties' agreement. See e.g., Providence Square Ass'n, Inc. v. Biancardi, 507 So.2d 1366, 1372 & n. 3 (Fla.1987); Hopkins v. Mills, 116 Fla. 550, 156 So. 532 (Fla.1934); Brown v. Brown, 501 So.2d 24, 26-27 (Fla. 5th DCA 1986), review denied, 511 So.2d 297 (Fla.1987); 9 Fla.Jur.2d, Cancellation, Reformation, *151 and Rescission of Instruments § 65 (1979).

A. Existence of an Agreement
Equity will decree reformation only where it is established that an agreement exists to which a writing may be made to conform. See, e.g., Langley v. Irons Land & Dev. Co., 94 Fla. 1010, 114 So. 769 (Fla.1927); Mills v. Mills, 339 So.2d 681 (Fla. 1st DCA 1976). Royal Group argues that since it did not actually execute any guaranty, there was never an agreement between the parties on which reformation may now be based. In support of its argument, Royal Group relies on the proposition of law that: "[W]here parties intend that their verbal negotiations shall be reduced to writing as the evidence of the terms of their agreement, there is nothing binding on them until the writing is executed." Rork v. Las Olas Co., 156 Fla. 510, 23 So.2d 839 (Fla.1945) (quoting Ocala Cooperage Co. v. Florida Cooperage Co., 59 Fla. 390, 394, 52 So. 13 (Fla.1910)).
The quoted language from Ocala Cooperage appears to suggest that no binding agreement exists upon the traditional handshake deal whenever the parties intend to later record their intentions in writing. It is in this sense that Royal Group asserts the passage's relevance. In both Ocala Cooperage and Rork, however, the court determined that the parties had intended that no agreement exist until written documents were executed. See Rork, 23 So.2d at 841-42; Ocala Cooperage, 52 So. 13 at 16. A distinctly different situation is present when the parties reach agreement, intend to be bound by their agreement and intend that a subsequent writing will merely memorialize the transaction.
The Supreme Court's implicit recognition of this distinction came in Shaffer v. Previews, Inc., 78 So.2d 376 (Fla.1955). There the plaintiff, Shaffer, sought to enforce an alleged oral agreement for payment of severance pay entered into between himself and Cymrot, attorney and treasurer for the defendant. Shaffer testified that the parties met, negotiated the terms of the deal, shook hands and, upon parting, Cymrot suggested that the verbal agreement be reduced to writing "for the purpose of the record." An agreement was drafted and was signed only by Shaffer. After trial, the lower court entered judgment for the defendant, apparently resolving the conflicting testimony on the parties' intent in favor of Cymrot. The Supreme Court upheld the judgment, not on the ground no writing was executed but because the questions of intent "were questions of fact which were resolved in defendant's favor by the trier of the factsin this case the trial judgeand, if believed, were sufficient to sustain his finding that there was `no binding completed agreement'." Id.
The District Courts of Appeal have also considered the distinction between intent to be bound upon agreement and intent to be bound upon execution of a written document. In Mann v. Thompson, 100 So.2d 634 (Fla. 1st DCA 1958), the parties had negotiated by mail the terms of a lease into which they were to enter. In denying the appellant specific performance of the lease, the court noted that while the parties had agreed on all of the terms except minor details, "the Chancellor who had the exclusive privilege of viewing the witnesses found no intention ... to consummate the alleged agreement before all the terms and conditions had been fully determined and formalized in an appropriately executed written document." In Housing Authority v. Foster, 237 So.2d 569 (Fla. 4th DCA 1970), citing Mann, the Fourth District stated that the rule of Ocala Cooperage is properly applied "only where the parties do not intend to be bound by their negotiations until a formal written contract is executed." Id. at 571-72.[5]
*152 The question of whether or not the parties' negotiations produced a binding agreement is a question of intent, which in turn is a question of fact. Summary judgment is proper only upon a showing that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fla.R.Civ.P. 1.510(c); Wills v. Sears, Roebuck & Co., 351 So.2d 29, 30 (Fla.1977). That burden has not been met by Royal Group in this case.
The record in this case reveals that Smith communicated his insistence on obtaining Royal Group's guaranties to Norman and Egerton. Egerton negotiated with Leeds concerning the guaranties, and the revised versions of the contracts, drafted by Royal Group's attorneys and mailed by them to Smith's attorney, contained guaranty provisions within them. Leeds testified that she would not have included those provisions without permission. Smith testified that Norman assured him Richardson would guaranty the payments. Egerton testified that Leeds told him Royal Group had agreed to guaranty the payments and that he communicated this information to his client. Smith further testified that he only entered into the agreements in reliance on the guaranty agreement with Royal Group. Royal Group admits knowing of Smith's demand but simply denies making such a commitment. It appears Richardson knew the agreement had been consummated and that Royal Imports was functioning even though he had not signed any guaranty. Whether Smith and Royal Group came to an agreement and whether it was to be effective prior to or only upon the execution of formal written contracts is a question to be resolved by the trier of fact.

B. The Effect of the Statute of Frauds on Reformation Actions
The second issue presented is whether a contract unenforceable under the statute of frauds is void and may not be the subject of a reformation action. No Florida case has decided this issue and, because it appears this question has undergone some evolution in the law, it bears some discussion.
That a contract unenforceable under the statute of frauds may not be reformed to comply with the statute was the position taken in the original Restatement of Contracts. Section 509 stated the general rule that reformation of an instrument within the statute was not allowed. Restatement of Contracts § 509(1)-(2) (1932). Florida Jurisprudence recites that "an instrument that is invalid because it is in violation of the law or because it does not comply with the statute of frauds is not subject to reformation." 9 Fla.Jur.2d, Cancellation, Reformation and Rescission of Instruments § 53 (1979) (footnotes omitted).[6] Most of the case law which holds to this effect, including that cited by Royal Group, has been based on the notion that to allow a contract unenforceable under the statute to be reformed is tantamount to the enforcement of an oral agreement and a corresponding nullification of the statute of frauds.
Smith has drawn our attention to a law review article by Professor Palmer of the University of Michigan, which harshly criticized section 509 of the first Restatement.[7] Palmer explained that reformation of a written document is separate and distinct from enforcement of that document, although often the actions are simultaneously brought. According to Palmer, the statute is not properly *153 applied until the written document, reformed to reflect the true intentions of the parties, is sought to be enforced. Thus the statute should never be a bar to an action for reformation.
Florida law appears to be consistent with Professor Palmer's view. Our state's case law holds that the statute operates only to prevent enforcement of an invalid agreement and does not operate to render such an agreement void. In Grossman v. Levy's, 81 So.2d 752 (Fla.1955), the supreme court stated:
Our statute of frauds, unlike the statutes of some states, does not declare an offending contract to be "void" or "invalid". Nor does it merit this construction, in spite of some casual language in Yates v. Ball, [132 Fla. 132, 181 So. 341 (1937)]. It merely states, so far as is relevant here, that "No action shall be brought whereby * * * to change [sic] any person * * * upon any agreement that is not to be performed within the space of one year from the making thereof." (Italics added.) The statute thus pertains exclusively to the remedy.... If a contract which offends the statute were absolutely void and a nullity, it could not be held, as it has long been held by this court, that the statute applies only to executory and not to executed contracts.
Id. at 753 (emphasis in original); see also Rice v. Insurance & Bonds, Inc., 366 So.2d 85, 87 (Fla. 3d DCA), cert. dismissed, 372 So.2d 469 (Fla.1979).
Reformation is an action to judicially reconstruct a written agreement to conform to the intentions of the parties. As reformation does not "charge" the other party with enforcement of the agreement, the statute of frauds has no effect on an action to reform a written document. See Orange State Oil Co. v. Crosby, 160 Fla. 664, 36 So.2d 273 (Fla. 1948), overruled on other grounds, All Florida Sur. Co. v. Coker, 88 So.2d 508 (Fla.1956); Miley v. Miley, 402 So.2d 557, 558 (Fla. 2d DCA 1981); Gennaro v. Leeper, 313 So.2d 70, 72 (Fla. 2d DCA 1975).
Although case law from some jurisdictions, such as those brought to this court's attention by Royal Group, continues to find the statute of frauds a bar to reformation, the Restatement view has changed. Section 156 of the Restatement (Second) of Contracts states the current rule: "If reformation of a writing is otherwise appropriate, it is not precluded by the fact that the contract is within the Statute of Frauds." The Reporter's Note following the section fortifies the conclusion that the statute of frauds is not a bar to a reformation action in Florida:
This Section rejects the rule stated in former § 509 that reformation of an instrument falling within the Statute of Frauds is not available unless there has been part performance or a written conveyance has been executed. The modern cases support the view that there is never sufficient reason for refusing reformation before it is determined whether the writing satisfies the Statute, since adequate safeguards can be afforded through a careful examination of the evidence.

Restatement (Second) of Contracts § 156 reporter's note (1981) (citation omitted) (emphasis added).

C. Use of Reformation to Supply a Missing Signature
Research reveals no case in Florida that confirms the authority of the court to add a signature to a document, although the issue has been raised.[8] Other jurisdictions have squarely held that such action is consistent with a court's equitable powers.[9] Given *154 that equity regards as done that which ought to be done, there is no compelling reason why a court may not reform a written instrument to reflect the intentions of the parties, including a party's omitted signature. Restatement (Second) of Contracts § 156; 2 Joseph M. Perillo and Helen H. Bender, Corbin on Contracts § 340 (1995); 76 C.J.S. Reformation of Instruments § 36 (1994) ("Where both parties to a deed or contract have agreed that the instrument is to be executed, the lack of a party's signature can be supplied by a reformation of the document." (footnote omitted)).
It is a point worth noting that, as section 156 of the second Restatement suggests, the safeguard of the defendant in a reformation action continues to lie in the plaintiff's burden of proving the intent of parties and, by clear and convincing evidence, demonstrating some ground for reformation such as mutual mistake or unilateral mistake coupled with inequitable conduct. See Newman v. Metropolitan Dade County, 576 So.2d 1352, 1353 (Fla. 3d DCA 1991); Ayers v. Thompson, 536 So.2d 1151, 1154 (Fla. 1st DCA 1988); 9 Fla.Jur.2d, Cancellation, Rescission, and Reformation of Instruments § 84 (1979). Provided the courts are rigorous in their application of this standard of proof, parties will not be subjected to obligations to which they never assented.

II. The Statute of Frauds as a Bar to Breach of Contract
Royal Group sought judgment on Smith's breach of contract claim under two provisions of the statute of frauds, arguing that both the guaranty and the one-year provisions of the statute were offended by the unsigned agreements. In ruling on the motion, the trial court found that any agreements between the parties were not within the guaranty provision of the statute because of the operation of the leading object rule.[10]See Al Booth's, Inc. v. Boyd-Scarp Enters., Inc., 518 So.2d 422 (Fla. 5th DCA 1988). The court also found, however, that the oral agreements, if any existed, could not be performed within one year and thus violated another portion of the statute.
As a preliminary matter, Smith's argument that the statute of frauds is satisfied by the February 2 letter from Leeds to Egerton is unpersuasive. Smith argues that the letter directly refers to Richardson's agreement on behalf of Royal Group that the latter would guaranty payments due Smith under the Covenant and Consultation Agreements, and, since the letter was signed by the company's attorney, the "signed writing or memorandum" requirement of section 725.01 is satisfied.
Smith considers this case to be "unmistakably analogous" to the one presented in Cook v. Theme Park Ventures, Inc., 633 So.2d 468 (Fla. 5th DCA 1994). The difference, however, between the case at bar and that in Cook lies in the contents of the respective letters. The letter in Cook not only referred to the enclosed documents but expressly invited performance by the recipient based in part on the contents of the unsigned documents and thereby represented the author's approval of them.
As for the issue of performance, the guarantied payment obligations of Royal Imports under both the Covenant and Consultation Agreement were to run for ten years. Smith's performance under the agreements consisted of ten years of both monthly consulting and refrainment from competition. Smith argues, however, that the contemplated contingency of his death successfully removes these agreements from the statute. We agree with Smith.
Contracts which by their terms are subject to defeasance or termination are to *155 be distinguished from contracts which provide for alternative methods of performance. While those of the former type are within the one-year provision of the statute of frauds, those of the latter variety are taken outside the statute if one of the alternative methods of full performance may be completed within a single year. 3 Williston on Contracts §§ 498-99 (3d ed. 1960). This is a technical but sound distinction based on the notion that the terms of a contract are not fulfilled where the occurrence of some contingency merely cancels the parties' agreement. Florida case law has recognized that, as death is unpredictable and may occur within a year of an agreement's making, a contract under which death within a year of the contract's making constitutes full performance by either side of the agreement is outside the one-year provision of the statute of frauds.[11]
The two contracts at issue in this case are slightly different. The Consultation Agreement provided that Smith would perform services for 10 years from the date of the agreement. It also provided that in the event of Smith's death during the 10-year period, the payments to Smith were to continue to his spouse or estate and that all such compensation shall be deemed earned and paid as "past consideration" for services already rendered. This agreement unmistakably contemplated Smith's death and provided that upon it Smith will have fully performedan alternative performance to the 10-year service period. Since there is no reason Smith might not have died within a year of the contract's making, the Consultation Agreement is outside the statute of frauds.
The Covenant contains a similar provision which provided that in the event of Smith's death, payments were to continue to Smith's spouse or, if she did not survive him, to his estate. The agreement further provided that if his spouse survived him but died before the ten years of payments had elapsed, then the payments were to go to his spouse's estate. Ordinarily a covenant not to compete is not outside the Statute of Frauds because of the mere contingency that the promisor might die during the noncompetition period. See 3 Williston on Contracts § 497 (3d ed. 1960). As Williston states, the contract would not be fully performed under such circumstances, although the same result would be achieved due to the inability of the deceased to break a negative promise. See id. The covenant in this case contemplated Smith's death and effectively provided that such would constitute Smith's full performance, even though the agreement lacks the more clear language seen in the Consultation Agreement. Considering also that by its terms the Covenant directly incorporates the Consultation Agreement, the two read together make this conclusion certain. Consequently, the Covenant is also outside the Statute of Frauds.
Based on the foregoing, we conclude that the trial court's order granting Royal Group summary judgment on the breach of contract and reformation claims was erroneous and should be reversed.
REVERSED and REMANDED.
GOSHORN and ANTOON, JJ., concur.
NOTES
[1] Royal Imports, Inc., d/b/a Royal Mitsubishi, Inc. All references to this company will be to Royal Imports.
[2] Since the time of these events, Key-Royal Automotive Company has changed its name to Royal Automotive Group, Inc. and shall hereafter be referred to as "Royal Group."
[3] On appeal, Royal Group insists the firm represented only Royal Olds but there is ample evidence in the record to the contrary.
[4] Royal Group also argues on appeal that because Norman and Smith made a change to the consultation agreement before executing it, it would be impossible to say that Royal Group had assented to the agreement. We do not credit this argument because the change was favorable to Royal Group.
[5] See also Club Eden Roc, Inc. v. Tripmasters, Inc., 471 So.2d 1322, 1323-24 (Fla. 3d DCA 1985) (finding parties intended no rights or obligations would arise until execution of agreement), review denied, 482 So.2d 350 (Fla.1986); Citizens Bank v. Harlie Lynch Constr. Co., 426 So.2d 52, 54 (Fla. 1st DCA 1983) (finding no intent to be bound until written instrument signed); Delta Elec. Contractors, Inc. v. McDevitt & Street Co., 262 So.2d 226, 227 (Fla. 2d DCA 1972) (reversing summary judgment where trial court failed to distinguish between intention to memorialize existing agreement and intention no agreement exist until execution of document); see also In re SeaEscape Cruises, Ltd., 172 B.R. 1002, 1011 (S.D.Fla.1994) ("[I]f the parties so intend, a contract is binding from the time it is made even though the parties also agree that the formal embodiment of its provisions will subsequently be prepared.").
[6] The volume cites only a section of American Jurisprudence. Set out in detail, that section elaborates:

In accordance with the rule that a court of equity will not and cannot reform an invalid or void instrument, a court of equity has no power, under the pretense of reformation, so to construct or reconstruct a contract as to make a complete contract out of one which, on its face, was incomplete or insufficient to meet the requirements of the statute of frauds, and this is true irrespective of any intention of the parties to conform to the requirements of the statute and of the fact that their failure to do so arose from mistake or ignorance.
66 Am Jur 2d, Reformation of Instruments § 38 (1973) (footnotes omitted); see also 37 C.J.S., Frauds, Statute of & sect; 245 (1943).
[7] George E. Palmer, Reformation: Statute of Frauds, 65 Mich.L.Rev. 421 (1967).
[8] Tri-County Produce Distribs., Inc. v. Northeast Prod. Credit Ass'n, 160 So.2d 46 (Fla. 1st DCA 1963). There, the court affirmed the reformation decree on other equitable grounds while stating that "[t]he decisions from this and other jurisdictions are replete with instances in which written instruments have been reformed on the ground of mutual mistake so as ... to add signatures of witnesses and seals to instruments which were inadvertently omitted." Id. at 49. The court cited an 1828 Connecticut case where the court purportedly reformed a mortgage to reflect an omitted signature.
[9] In re Snide, 96 Misc.2d 513, 409 N.Y.S.2d 204 (N.Y.Surr.Ct.1978), rev'd, 74 A.D.2d 930, 426 N.Y.S.2d 155 (N.Y.1980), rev'd, 52 N.Y.2d 193, 437 N.Y.S.2d 63, 418 N.E.2d 656 (1981) (reforming husband's will to reflect his and not his wife's signature where husband and wife executed wills together and each inadvertently signed the others' documents); Ames v. Fallert, 61 Or.App. 415, 657 P.2d 224 review denied, 294 Or. 682, 662 P.2d 726 (1983) (affirming reformation of deed to reflect plaintiff's signature where evidence clearly showed plaintiff intended to sign deed and, by the mutual mistake of parties, failed to do so); Nelson v. Albrechtson, 93 Wis.2d 552, 287 N.W.2d 811 (1980) (holding lack of a grantor's signature on a conveyance can be cured by court in equity); Security Pac. Nat'l Bank v. Ginkowski, 140 Wis.2d 332, 410 N.W.2d 589 (Ct.App.), review denied, 141 Wis.2d 984, 416 N.W.2d 296 (1987) (same).
[10] Though not briefed by the parties, this is another interesting issue, about which we express no opinion. For purposes of our analysis of the summary judgment, we will assume the correctness of this ruling.
[11] See Berger v. Jackson, 156 Fla. 251, 768, 23 So.2d 265, 267 (Fla.1945); Hesston Corp. v. Roche, 599 So.2d 148, 152 (Fla. 5th DCA 1992); Schenkel v. Atlantic Nat'l Bank, 141 So.2d 327, 330 (Fla. 1st DCA), cert. denied, 148 So.2d 280 (Fla.1962); cf. First Realty Inv. Corp. v. Gallaher, 345 So.2d 1088, 1089 (Fla. 3d DCA 1977), cert. denied, 359 So.2d 1214 (Fla.1978); Niagara of Florida, Inc. v. Niagara Therapy Mfg. Corp., 231 So.2d 277, 277 (Fla. 2d DCA), cert. denied, 237 So.2d 763 (Fla.1970).